Motlow. v. State.

---

## LEM MOTLOW *v.* STATE.[*]

### (*Nashville.* December Term, 1911.)

1. **CONSTITUTIONAL LAW.** Classification of police laws is permitted unless purely arbitrary and without reasonable basis.

The provision of the eighth section of the first article of our State constitution, embracing "the law of the land" clause, when read in connection with the first clause of the eighth section of the eleventh article the same constitution, is substantially the same as that contained in the second clause of the first section of the fourteenth amendment to the federal constitution, and does not take from the State the power of classification in the enactment of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and, therefore, purely arbitrary; for a classification having some reasonable basis does not offend against that provision merely because it is not made with mathematical nicety, or because in practice it results in some inequality. (*Post, pp.* 559, 560.)

Constitution cited and construed: State const., art. 1, sec. 8; art. 11, sec. 8, cl. 1; federal const., 14th am., sec. 1, cl. 2.

Case cited and approved: Lindsley v. Gas Co., 220 U. S., 61.

2. **SAME.** Same. Presumption of facts sustaining classification in police laws; burden on assailant of classification.

When the classification in a police law is called in question, or asserted to be in conflict with said constitutional provisions (art. 1; sec. 8, and art. 11, sec. 8), any state of facts that can be reasonably conceived that would sustain it will be assumed to have existed when the law was enacted; and one assailing the classification in such law must bear the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary. (*Post, pp.* 559, 560.)

Citations: See under preceding headnote.

---

[*]Constitutional right to prohibit sale of intoxicating liquor, see note in 15 L. R. A. (N. S.), 908.

Motlow v. State.

3. INTOXICATING LIQUORS. Licenses may be issued for their sale for certain nonbeverage purposes.

Acts 1909, chs. 13 and 14, when construed in connection with Acts 1899, ch. 161, and Acts 1909, chs. 1 and 10, were not intended as a general withdrawal of the power to issue licenses, except for the sale of intoxicating liquors as a beverage, and thereunder a license may still be issued, under which the holder may sell intoxicating liquors for medical, mechanical, chemical, scientific, and sacramental purposes, and for these purposes only    (Post, pp. 560-562.)

Acts cited and construed:    Acts 1899, ch. 161; Acts 1909, chs. 1, 10, 13, 14.

Cases cited and approved:    Druggist Cases, 85 Tenn., 449, 457; Kelly v. State, 123 Tenn., 516, 531 et seq., 550.

4. SAME.    Alcohol 188 proof is an "intoxicating liquor," included in the statutory classes of intoxicating liquors.

Alcohol 188 proof, expressly excepted from the statute (Acts 1909, ch. 10) which prohibits the manufacture of intoxicating liquors, including all vinous, spirituous, or malt liquors, for purposes of sale, is an "intoxicating liquor" included within said classes, and not exclusive thereof.    (Post, p. 562.)

Case cited and approved:    Marks v. State, 159 Ala., 71, 83.

5. CONSTITUTIONAL LAW.    Statute prohibiting manufacture of intoxicating liquors for sale, excepting alcohol 188 proof, is not invalid for its such classification.

The statute (Acts 1909, ch. 10), which in effect puts the manufacturers of intoxicating liquors in a separate class, by forbidding them to manufacture, for sale, any intoxicating liquors, including all vinous, spirituous, or malt liquors, all of which may be sold for certain nonbeverage purposes, excepting the manufacture of alcohol 188 proof for chemical, pharmaceutical, medical, and bacteriological purposes, has a reasonable tendency towards making the other prohibition laws more effective by diminishing the quantity of such liquor and making it more

Motlow v. State.

difficult and expensive to obtain the same, and hence rests upon a sufficient ground for the classification. (*Post, pp.* 559, 562, 563.)

Acts cited and construed:  Acts 1909, ch. 10.

6. **INTOXICATING LIQUORS.  Judicial notice of activities of brewers and distillers in opening and maintaining saloons to sell their products.**

It is a matter of judicial knowledge on the part of the supreme court, arising out of the history of the liquor litigation in this State, that the breweries actively encourage and foster the opening and maintaining of saloons to enable them to sell their product, and that distilleries have places where the product is stored for the convenience of the market. (*Post, p.* 563.)

7. **CONSTITUTIONAL LAW.  Statute prohibiting manufacture of intoxicating liquors, for sale, but excepting alcohol 188 proof, is not invalid for its classification.**

The statute (Acts 1909, ch. 10), prohibiting the manufacture of any intoxicating liquor, including all vinous, spirituous, or malt liquors, for purposes of sale, but allowing the manufacture of alcohol of not less than 188 proof for chemical, pharmaceutical, medical, and bacteriological purposes, is not arbitrary or unreasonable in its classification, on account of such exception of alcohol, since alcohol of 188 proof would have far less tendency than commercial liquors to impair the operation of the prohibition laws, and since there is no discrimination except as to the grade of the product, and no discrimination as against the manufactures themselves. (*Post, pp.* 563-565.)

Acts cited and construed:  Acts 1909, ch. 10.

8. **SAME.  Same.  Such statute does not unjustly, unreasonably, and arbitrarily discriminate against liquor manufacturers in this State and in favor of those in other States.**

The statute (Acts 1909, ch. 10) does not, by its provisions stated in the preceding headnote, unjustly, unreasonably, and arbitrarily discriminate against liquor manufacturers in this State and in favor of liquor manufacturers in other States, whose

Motlow v. State.

products may be sold here for medical and other nonbeverage purposes, through the means of interstate commerce importations into this State, because the object of the statute is to prevent the impairment and violation of the prohibition laws, and the local manufacturers, if not prohibited, could easily make much more than would be required for such medical and other nonbeverage purposes, and it would be expensive and difficult, if not impossible, to prevent sales of their products in violation and impairment of the prohibition laws. (*Post, pp.* 565, 567.)

Acts cited and construed: Acts 1909, ch. 10.

9. **INTERSTATE COMMERCE. Importation of intoxicating liquors from other States cannot be prohibited by the State; failure to attempt it is no discrimination.**

The State has no power to prohibit the importations of intoxicating liquors from other States or countries, as such traffic is regulated wholly by federal law; and no discrimination can be rightly charged on the ground that the State fails to act on a matter as to which it has no power. (*Post, pp.* 565, 566.)

10. **INTOXICATING LIQUORS. Prohibition of their manufacture for lawful sale here is within the police power.**

While it is lawful to sell, in this State, intoxicating liquors (such as whisky, brandy, wine, beer, and ale), for medical and other nonbeverage purposes, still it is within the police power of the State to forbid the manufacture of such liquors for sale. (*Post, pp.* 566-571.)

Acts cited and construed: Acts 1909, ch. 10.

Cases cited and approved: Theilan v. Porter, 14 Lea, 622; Neas v. Borches, 109 Tenn., 398; Kidd v. Pearson, 128 U. S., 19-22; Crowley v. Christensen, 137 U. S., 86, 90, 91, 92; Lawton v. Steele, 152 U. S., 133, 136; Lemieux v. Young, 211 U. S., 489; Kidd v. Musselman, 217 U. S., 461; Schmidt v. Indianapolis, 168 Ind., 631.

Motlow v. State.

11. **CONSTITUTIONAL LAW. Legislative power is complete except as restrained by State or federal constitution.**

The legislative power is complete, except in the particulars in which it is restrained by the constitution of the State or that of the United States. (*Post, p.* 566.)

12. **SAME. Same. Restrictions in constitution must be pointed out.**

Whoever would deny the power of the legislature to pass any act on the ground of constitutional restrictions must be able to put his finger on the clause in the constitution which creates the restriction, or from which there is such necessary implication. (*Post, p.* 566.)

Cases cited and approved: Demoville v. Davidson Co., 87 Tenn., 214; Stratton v. Morris, 89 Tenn., 497; Redistricting Cases, 111 Tenn., 234, 291.

13. **SAME. Criminal laws involving life and liberty are based upon police power and may include manufacture of intoxicating liquors.**

The whole body of the criminal law is but a branch of the police power, under which men and women may be deprived of their liberty and their lives, and there is nothing in the manufacture of whisky greater than these. (*Post, pp.* 571, 572.)

14. **INTOXICATING LIQUORS. Manufacture and sale may be totally prohibited by the State.**

The State has the power to enact legislation totally prohibiting the manufacture and sale of intoxicating liquors. (*Post, pp.* 572-582.)

Cases cited and approved: Druggist Cases, 85 Tenn., 458; Webster v. State; 110 Tenn., 491, 504, 506; Kelly v. Connor, 122 Tenn., 339, 374, 375; Bartemeyer v. Iowa, 18 Wall., 129; Boston Beer Co. v. Massachusetts, 97 U. S., 25; Foster v. Kansas, 112 U. S., 205; Mugler v. Kansas, 123 U. S., 623; Powell v. Pennsylvania, 127 U. S., 678; Kidd v. Pearson, 128 U. S., 1; Schollenberger v. Pennsylvania, 171 U. S., 1; Dairy Co. v. Ohio, 183 U. S., 238,

Motlow v. State.

246; State v. Durein, 70 Kan., 1; Cureton v. State, 135 Ga., 660; Sarrls v. Commonwealth, 83 Ky., 327.

15. **CONSTITUTIONAL LAW.** Prohibitory statute including innocent acts because of difficulty in separating the good from the bad, and fraud, is not unconstitutional.

A prohibitory statute, passed under the police power of the State, although it is so broad as to include within its scope acts otherwise innocent, but included because of the difficulty of separating the good from the bad, and because of the danger of fraud, does not violate the provisions of the fourteenth amendment to the constitution of the United States. (*Post, pp.* 582-588.)

Constitution (U. S.) cited and construed: 14th am.

Cases cited and approved: Booth v. Illinois, 184 U. S., 425, 428; Otis v. Parker, 187 U. S., 606; Ah Sin v. Wittman, 198 U. S., 500.

16. **INTOXICATING LIQUORS.** Manufacture may be totally prohibited, though sales be permitted for certain nonbeverage purposes.

Although it is lawful to sell intoxicating liquors in this State for medical, mechanical, and scientific purposes, the manufacture of such articles in this State, though in and of itself not immoral, may be prohibited, because of the great opportunity afforded by the presence of breweries and distilleries for aiding those whose purpose and desire to violate the laws prohibiting the sale of intoxicating liquors as a beverage, and because of the temptation on the part of the brewers and distillers themselves to encourage such violations in order to make profits. (*Post, pp.* 587, 588.)

See citations under preceding headnote.

17. **CONSTITUTIONAL LAW.** Manufacture of intoxicating liquors for sale and exportation to other States and countries may be prohibited.

Motlow v. State.

The State legislature has the constitutional power to enact laws prohibiting the manufacture of intoxicating liquors for sale and exportation to other States and countries. (*Post, pp.* 588, 589.)

Case cited and approved: Kidd v. Pearson, 128 U. S., 19, 20.

18. **INTOXICATING LIQUORS.   Manufacture for sale, but not for sale as a beverage in this State, means for sale abroad, and for nonbeverage purposes in Tennessee.**

The manufacture of intoxicating liquors "for purposes of sale," but not "for purposes of sale as a beverage within the State of Tennessee," can only mean that the manufacture is for the purpose of sale abroad, and also for the purpose of sale in Tennessee for medical, mechanical, and scientific purposes. (*Post, pp.* 588, 589.)

19. **POLICE POWER.   Its scope and extent for preservation of public safety, health, and morals is undefined.**

The police power is a necessary power, inhering in every sovereignty, for the preservation of the public safety, the public health, and the public morals. It is of vast and undefined extent, expanding and enlarging in the multiplicity of its activities as exigencies demanding its service arise in the development of our complex civilization. (*Post, p.* 589.)

20. **SAME.   Function of government solely for the legislature's judgment as to its policy and wisdom.**

It is a function of government, solely within the domain of the legislature, to declare when the police power shall be brought into operation, for the protection or advancement of the public welfare, and to judge of the wisdom and policy of the law. (*Post, p.* 589.)

21. **SAME.   Same.   Function of courts to determine whether statute tends to protect public safety, health, and morals, and whether constitutional.**

In determining whether a statute enacted under the police power, and discriminating between particular classes of persons, is reasonable, the courts have no power to pass upon the statute

with a view to determining whether it was dictated by a wise or foolish policy, or whether it will ultimately redound to the public good, or whether it is contrary to natural justice and equity, because these are considerations solely for the legislature; but the function of the courts is merely to decide whether it has any real tendency to carry into effect the purposes designed, namely, the protection of the public safety, the public health, or the public morals, and whether that is really the end had in view, and whether the interests of the public generally, as distinguished from those of a particular class, required such interference, and whether the statute in question violates any provision of the State or federeal constitution. (*Post, pp.* 589, 590.)

22. SAME. Same. Same. Constitutional provisions authorizing courts to control legislative exercise of police power.

The constitutional provisions authorizing the courts to assert control over the exercise of the police power by the legislature are, among others, article 1, section 8, and article 11, section 8, of our State constitution, and the fourteenth amendment to the federal constitution, which are in effect the same, and which provide in substance that no one shall be deprived of his life, liberty, or property but by due process of law, or the law of the land, and that no one shall be deprived of the equal protection of the laws. ·(*Post, p.* 590.)

Constitution cited and construed:   Art. 1, sec. 8, and art. 11,, sec. 8 (State); 14th am. (U. S.).

23. CLASSIFICATION IN LEGISLATION.   Must rest upon some natural or reasonable basis, and be approximately applicable to all members of the class.

The constitutional provisions mentioned in the preceding headnote forbid that any mere individual shall be singled out for legislative action, but do not deny the right to the legislature to make proper classifications for purposes of legislation; but such classification must rest upon some natural or reasonable basis, having some substantial relation to the public welfare,

Motlow v. State.

and the same provisions must approximately apply in the same way to all the members of the class. (*Post, pp.* 590, 591, 592.)

Constitution cited and construed:  Art. 1, sec. 8, and art. 11, sec. 8 (State); 14th am. (U. S.).

Cases cited and approved:  Marr v. Bank, 4 Lea, 578, 585; Leeper v. State, 103 Tenn., 500, 531; Dayton v. Barton, 103 Tenn., 604; Harbison v. Iron Co., 103 Tenn., 421; Webster v. State, 110 Tenn., 491, 504, 506; Samuelson v. State, 116 Tenn., 470; Morrison v. State, 116 Tenn., 534; Malone v. Williams, 118 Tenn., 390; State v. Mill Co., 123 Tenn., 399; Yick Wo v. Hopkins, 118 U. S., 356; Mugler v. Kansas, 123 U. S., 623; Lawton v. Steele, 152 U. S., 133; Railroad v. Ellis, 165 U. S., 150; Holden v. Hardy, 169 U. S., 366; Otis v. Parker, 187 U. S., 606, 608; Railroad v. May, 194 U. S., 267, 269, 270; Dobbins v. Los Angeles, 195 U. S., 223, 236, 237; Reduction Co. v. Reduction Works, 199 U. S., 306, 318, 319.

24. **SAME.**   Same.   Reasonableness thereof embraces proper classification.

The doctrine of reasonableness in classification in legislation embraces, as a part thereof, the subject of proper classification, as indicated in the preceding headnote, and the two subjects cannot be clearly separated in the authorities; but the cases cited hereunder may be regarded as being especially interesting upon this particular phase of the inquiry. (*Post, pp.* 591, 592.)

Cases cited and approved:  Stratton v. Morris, 89 Tenn., 497; Dugger v. Insurance Co., 95 Tenn., 245; Debardelaben v. State, 99 Tenn., 649; Railroad v. Harris, 99 Tenn., 684; Malone v. Williams, 118 Tenn., 390; Ledgerwood v. Pitts, 122 Tenn., 570; State v. Railroad, 124 Tenn., 1; State, ex rel., v. Powers, 124 Tenn., 553; Yick Wo v. Hopkins, 118 U. S., 356; Railroad v. Ellis, 165 U. S., 150; Holden v. Hardy, 169 U. S., 366; Magoun v. Bank, 170 U. S., 293-296; Connolly v. Pipe Co., 184 U. S., 540, 559, 560; Railroad v. May, 194 U. S., 267, 269, 270; Railroad v. McGuire, 219 U. S., 549, 565.

Motlow v. State.

25. **SAME.** Reasonableness thereof has a wider scope in municipal ordinances than in State legislation under police power.

In cases involving municipal ordinances, the doctrine of reasonableness in classification has a wider scope than in cases of classification in State legislation under the police power, because such ordinances must be tested, not only by the constitution, but also by the statutes of the `State, and by the common law    (*Post, p.* 591, 592.)

Cases cited and approved:    Maxwell v. Jonesboro, 11 Heis., 257; Ward v. Mayor, 8 Bax., 228; Grills v. Mayor, 8 Bax., 247; Newbern v. McCann,. 105 Tenn., 159; Yick Wo v. Hopkins, 118 U. S., 356.

26. **CONSTITUTIONAL LAW.**    Exemption of manufactured articles from taxation does not prevent police legislation prohibiting the manufacture of intoxicating liquors.

The statute (Acts 1909, ch. 10), which in effect puts the manufacturers of intoxicating liquors in a separate class, by forbidding them to manufacture, for sale, any intoxicating liquors, except alcohol 188 proof, does not violate the constitutional provision (art. 2, sec. 30) that "No article manufactured of the produce of this State shall be taxed otherwise than to pay inspection fees," because the State did not, by the granting of the tax exemption, and thereby encouraging the manufacture of intoxicating liquors, impliedly surrender its police power, the ultimate means of self-preservation, so as to prevent the enactment of legislation prohibiting such manufacture. (*Post, pp.* 559, 593, 594.)

Constitution cited and construed:    Art. 2, sec. 30.

27. **JUDICIAL NOTICE.**    None that intoxicating liquors are manufactured out of the produce of this State.

The supreme court cannot take judicial notice that a manufacturer of intoxicating liquors confined himself, in respect to the raw materials used, to the produce of this State, or even that he uses any such raw material of the produce of this State. (*Post, p.* 593.)

Constitution cited and construed:    Art. 2, sec. 30.

Motlow v. State.

FROM MOORE.

Appeal from the Circuit Court of Moore County.—
Ewin L. Davis, Judge.

Carter, Lamb & Lamb, Parks & Bean, and Frank
P. Bond, for Motlow.

Attorney-General Cates, for State.

Mr. Justice Neil delivered the opinion of the Court.

The indictment in the present case charges that Lem
Motlow, on the 25th day of May, 1911, in Moore county,
this State, unlawfully operated a whisky distillery, "and
did then and there distill and manufacture spirituous,
vinous, malt, and intoxicating liquors for the purpose
of sale, contrary to the statute in such cases made and
provided, and against the peace and dignity of the
State." There was a motion to quash the indictment,
but as the same questions were made on the trial, we
shall pass these without further notice.

The agreement as to the evidence was as follows:

That the defendant, Lem Motlow, on the 25th day
of May, 1911, was the proprietor of the Jack Daniels
distillery, located in Moore county, this State, and on
that day manufactured 375 gallons of intoxicating
liquors—that is to say, whisky 100 proof—for purposes
of sale; "but," continues the agreement, "said whisky

was not made for purposes of sale as a beverage within the State of Tennessee."

The defendant was convicted, and sentenced to pay a fine of $250, and to confinement in the county jail for a period of ninety days, and to pay the costs of the proceeding. He thereupon made a motion for new trial, which was overruled, and he then appealed to this court.

The act on which the prosecution was based is chapter 10 of the Acts of 1909, which is as follows:

"An act to prohibit the manufacture in this State of intoxicating liquors for the purpose of sale.

"Section 1. Be it enacted by the general assembly of the State of Tennesseee, that it shall not hereafter be lawful for any person or persons to manufacture in this State, for purposes of sale, any intoxicating liquor, including all vinous, spirituous, or malt liquors, and that any one violating the provisions of this act shall be guilty of a misdemeanor, and, upon conviction, shall be punished by a fine, for each offense, of not less than $250 nor more than $1,000 and imprisonment for a period of not less than ninety days nor more than twelve months; provided, this section shall not be so construed as to prohibit the manufacture of alcohol of not less than 188 proof for chemical, pharmaceutical, medical, and bacteriological purposes.

"Sec. 2. Be it further enacted, that the grand juries of this State shall have and exercise inquisitorial power in respect to violations of this act, and it shall be the duty of the circuit and criminal judges of the State to give the same in charge to them.

"Sec. 3. Be it further enacted, that all laws in conflict with this act be, and the same are hereby, repealed.

"Sec. 4. Be it further enacted, that this act shall take effect from and after January 1, 1910, the public welfare requiring it."

This act was passed over the veto of the governor on February 4, 1909.

What the act in question has done is simply to put into a separate class the manufacturers of intoxicating liquors, and forbid them to make for sale any such liquors, except alcohol 188 proof.

Was the creation of such a class an arbitrary act, or is there any reason by which it can be justified? The principles on which the inquiry should be conducted are those laid down in a very recent opinion of the supreme court of the United States, in *Lindsley* v. *Natural Carbonic Gas Co.*, 220 U. S., 61, 31 Sup. Ct., 337, 55 L. Ed., 369: "(1) The equal protection clause of the fourteenth amendment does not take from the State the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore it is purely arbitrary. (2) A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality. (3) When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts

at the time the law was enacted must be assumed.   (4) One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary."   The same rules must apply in disposing of a question arising under article 1, section 8, of our constitution of 1870, embracing the "law of the land" clause, because its provisions are in this regard, taken in connection with the first clause of section 8 of article 11, substantially the same as those contained in the second clause of the first section of the fourteenth amendment to the federal constitution.

At the time the act was passed, the situation in Tennessee was this: Sundry statutes had been passed, known as "four-mile laws," which had made it unlawful to sell intoxicating liquors as a beverage anywhere in the State within four miles of a schoolhouse, whether the school was in session at the date of the sale or not.   These acts made it unlawful to sell intoxicating liquors anywhere in this State as a beverage, since there was no point that was not within four miles of a schoolhouse.   The last of these acts (chapter 1, Acts of 1909) was passed January 23, 1909, and went into effect July 1, 1909, and made the series of four-mile laws complete.   Furthermore, by Acts of 1899, ch. 161, it had been made unlawful to sell intoxicating liquors anywhere in Tennessee for any purpose without a license.   No license could be issued which would give authority to violate the four-mile law.   Therefore no license could be issued for the sale of intoxicating liquors at any point in Tennessee,

Motlow v. State.

unless for sale for nonbeverage purposes; that is, for medical, mechanical, chemical, or scientific purposes, and wine for sacramental use. These laws are reviewed in *Kelly* v. *State*, 123 Tenn., 516 (and see particularly page 531 *et seq.* and page 550), 132 S. W., 193. I am of the opinion, however, that the right to issue licenses for the latter purpose lasted only until July 1, 1909, because on February 5, 1909, chapters 13 and 14 of the Acts of that year were passed, which forbade the issuance of licenses to run for any longer date than July 1, 1909. After that date, as I think, no license for any purpose could be issued, and prohibition was complete in the State. My opinion is that these laws should all be construed together, or in *pari materia,* including Acts of 1899, ch. 161. So construing them, it is evident, as I think, that the purpose of the legislature was that no intoxicating liquors should be sold at all, except alcohol 188 proof, and this only for chemical, medical, pharmaceutical, and bacteriological purposes, for the sale of which no license was required; the statute giving by implication the authority to sell. I think the legislature must be considered as having had in mind chapters 13 and 14 when chapter 10 at the same session was passed; these three acts, with chapter 1, Acts of 1909, being all of a piece, chapter 10 having been passed likewise on February 4, 1909, and chapters 13 and 14 on February 5th, but chapter 10 by its terms not taking effect until January 1, 1910. So that when chapter 10 went into effect, no license could be issued for

125 Tenn.—36

any purpose, and nothing in the form of intoxicating liquors could be sold, except alcohol 188 proof, and that only for the purposes mentioned in the act itself. Perhaps, however, considering Acts of 1899, ch. 161, in connection with the act of 1885, construed in the *Druggist Cases,* 85 Tenn., 449, 457, 3 S. W., 490, druggists may yet sell wine for sacramental purposes without any license other than a druggist's license.

However, the majority of the court are of the opinion that chapters 13 and 14 of the Acts of 1909 were not intended as a general withdrawal of the power to issue licenses except for sale of intoxicating liquors as a beverage, and that a license may still be issued, under which the holders may sell intoxicating liquors for medical, mechanical, chemical, scientific, and sacramental purposes, and for these purposes only. The majority are of the opinion that alcohol of 188 proof, referred to in chapter 10, Acts of 1909, is an intoxicating liquor (*Marks* v. *State,* 159 Ala., 71, 83, 48 South., 864, 133 Am. St. Rep., 20, and cases cited), included within the classes just mentioned, and not exclusive thereof.

Now, did chapter 10 have any reasonable tendency towards making effective the prohibition laws referred to? Or, to state the question differently, would breweries and distilleries operating in this State, producing thousands of gallons of beer and whisky and brandy every year, make it easier for those desiring to violate the prohibition laws to find the means of accomplishing that result? If these factories stopped, would it be more difficult and more expensive for persons desiring such

beverages for sale to obtain them?   There is only one
possible answer to these questions, and that is so ob-
vious that it is unnecessary to state it in terms.   If it
be true, then, that the producing of so much intoxicat-
ing liquor in the State would make it more difficult to
maintain the prohibition laws, and the ceasing of the
manufacture would tend to make it easier to maintain
these laws, then there was ample ground for the classi-
fication.   Moreover, it is a matter of judicial knowl-
edge on the part of the court, arising out of the history
of this class of litigation in the State, that the brewer-
ies actively encourage and foster the opening and main-
taining of saloons to enable them to sell their product,
and that distilleries have places where the product is
stored for the convenience of the market.

The conclusion as to the reasonableness of the act is
not lessened in force by the construction placed on the
acts by the majority of the court, to the effect that li-
censes may still be issued for the sale of intoxicating
liquors for nonbeverage purposes, because it would still
be true that the suppression of the home manufacture of
such liquors would make it easier to maintain the pro-
hibition laws.

But it is said the classification is arbitrary, because
the statute excepts the manufacture of alcohol of 188
proof and forbids the manufacture of all other kinds of
intoxicating liquors.   It is not arbitrary or unreason-
able, because alcohol of the high proof mentioned could
be made potable only by dilution with water, and then
could not have the palatable qualities of commercial

whisky, brandy, wine, or beer, and hence would have far less tendency to impair the operation of the prohibition laws. Again, there is nothing in the record to indicate that the machinery which manufactures whisky and brandy, and even beer, would not be efficacious likewise for the making of alcohol 188 proof, and there would be no discrimination against the manufacture as such, but only as to grades of the product. If there would be such discrimination against the manufacturers themselves, if there is anything in the point, the burden would be upon defendant to show it, and it has not been shown.

It is said that defendant, as the manufacturer of a product suitable for medical, mechanical, chemical, and scientific purposes, stands in the position of any other manufacturer producing a lawful product, and that a law which permits other manufacturers to produce their lawful product, and forbids him to produce his lawful product, is arbitrary and unreasonable. This would be a sound view, we think, if there was a discrimination between manufacturers of the same product. But there is no such discrimination. No one is permitted to manufacture in this State whisky, brandy, wine, ale, beer, or other intoxicating drink for sale, except alcohol 188 proof, and all are permitted to manufacture that. Of course, the argument could not be made, nor was it intended to be made, that, because there was no restriction upon the manufacture of cotton goods, or agricultural implements, therefore there could be none on the manufacture of intoxicating liquors. This latter has

been the subject of special police regulation for a long period of time.

It is said there is a discrimination in favor of the manufacturers of other States, because they are permitted to sell their product in this State for medical purposes, when the local manufacturer cannot. Stated differently, the point is that the druggist, say in this State, desiring to sell for medical purposes, may purchase the goods in other States and bring them here. Therefore it is unjust, unreasonable, and arbitrary to forbid the local manufacturer to make the liquor and sell to the druggist. This argument overlooks the cardinal point, already mentioned, that the local manufacturer could easily make vastly more than would be required for such purposes, and the means of detection would be extremely difficult, and the watching would be expensive, and with every safeguard it would be impossible to prevent his selling in such a way as to impair the prohibition laws; while the foreign manufacturer is far away, the local druggists are few in number and widely scattered that could afford to pay the large license fee to sell the small amount of goods they could sell for medical and other nonbeverage purposes, and under federal law every gallon could be noted and known as shipped in by express or freight, because the package would have to be marked with name and contents. In addition, the State has no power to prohibit importations from other States or countries. That is regulated wholly by federal law. No discrimination can be rightly

charged on the ground that the State fails to act on a matter as to which it has no power.

It is said that "it is not within the police power of the legislative department of the State government to declare the doing of a lawful act, with the intent of doing another lawful act, a crime," by which it is meant to say that, inasmuch as it is lawful to sell, in this State, intoxicating liquors, such as whisky, brandy, wine, beer, and ale, for medical and other nonbeverage purposes, it cannot be otherwise than unconstitutional for the legislature to forbid the manufacture of these liquors for sale. The conclusion by no means follows. With the same reason it might be said that, inasmuch as it is lawful in this State to sell liquors to buyers in a foreign State, it would be unconstitutional to forbid its manufacture here; but in *Kidd* v. *Pearson*, 128 U. S., 19-22, 9 Sup. Ct., 6, 32 L. Ed., 346, this precise point was held contrary to plaintiff in error's contention.

Moreover, the legislature has all the power that the people themselves have—that is, complete legislative power—except in the particulars in which that power is restrained by the constitution of the State or of the United States. Whoever would deny the power of the legislature to pass any act on the ground of constitutional restrictions must be able to put his finger on the clause in the constitution which creates the restriction (*Demoville* v. *Davidson County*, 87 Tenn., 214, 10 S. W., 353; *Stratton Claimants* v. *Morris Claimants*, 89 Tenn., 497, 15 S. W., 87, 12 L. R. A., 70), or from which there is such necessary implication (*The Redistricting Cases*,

⊥11 Tenn., 234, 291, 80 S. W., 750). There is no such provision. Grant that whisky, brandy, and the like are useful liquors for medical and other nonbeverage purposes. It is also true that the evil which flows from their use as a beverage overwhelmingly outweighs the good service they perform as medical and other nonbeverage agents. And although their deleterious effects are so widespread and so well known, it has been found almost impossible for the governing agencies of the State to restrain their unlawful use. Without doubt the presence of a distillery or a brewery in a city or community would in every instance make it more difficult for the authorities to maintain the State's prohibition laws, while the absence of such a business would make it correspondingly easier. Indeed, we believe it practically impossible to sustain these laws without the abolition of the breweries and distilleries. Now, the argument is that the State cannot constitutionally use this great aid to the maintenance of its policy because it is lawful to sell the small amount of whisky and brandy needed for medical and other nonbeverage purposes. This argument does not consider the wants of the people to be served, because it is conceded, and cannot be denied, that all intoxicating liquors needed for such purpose can be readily procured abroad, to say nothing of the reservation in the act as to the manufacture of alcohol 188 proof, which we must treat as being adapted to the purpose, since no evidence is adduced to the contrary. The objection, then, is based, and can be based, only upon the proposition that the manufacture

of such goods is a right of property, and that a right of property cannot be destroyed under the police power of the State.

It has been decided in this State that a house may be pulled down and destroyed despite the owner's objection, because it is, from its condition, dangerous to the health and safety of the people. *Theilan* v. *Porter,* 14 Lea, 622, 52 Am. Rep., 173. It is a matter of common experience that walls are ordered thrown down when deemed in an unsafe condition after a fire, and that houses are destroyed to prevent the spread of a conflagration. To this head are also to be referred the laws prohibiting the making or mending of burglars' tools, and authorizing their seizure and destruction, and generally of things specifically designed for the commission of crime; also laws taxing dogs, requiring their registration, or requiring them to wear collars or muzzles, and authorizing their destruction if found running at large in violation of the law; also laws forbidding the carrying of concealed deadly weapons. *Lawton* v. *Steele,* 152 U. S., 133, 136, 14 Sup. Ct., 499, 38 L. Ed., 385; Black, Const. Law, sec. 155. For the preservation of the public morals, it has been held that the legislature may prohibit the publication, exhibition, or sale of obscene books or pictures; that it may also prohibit the keeping of gaming tables, or other gambling devices, and provide for their seizure and destruction; that it may prohibit dealings on the stock exchange on margins, or the purchase and sale of "options" or "futures;" that it may prohibit lotteries and gift enterprises. Black, Const. Law, sec. 155, pp.

397, 398. On the same ground, and particularly to prevent fraud, it has been held that the legislature can forbid the sales of stocks of merchandise in bulk, without first making an inventory and giving notice to all creditors. *Neas* v. *Borches,* 109 Tenn., 398, 71 S. W., 50, 97 Am. St. Rep., 851; *Lemieux* v. *Young,* 211 U. S., 489, 29 Sup. Ct., 174, 53 L. Ed., 295; *Kidd* v. *Musselman,* 217 U. S., 461, 30 Sup. Ct., 606, 54 L. Ed., 839. For the preservation of the public health it has been held that the draining of swamp lands may be enforced, a well may be required to be filled up, a rice crop within the limits of a city may be destroyed, animals affected with contagious disease may be excluded from the State, and those within the State may be destroyed, and infected clothing may be burned. Black, Const. Law, 399, 400. Yet it is contended that the property right involved in the manufacture of whisky, brandy, and beer, which affect the public safety more than war, the public health more than pestilence, and the public morals more than any other agency known to man, cannot be destroyed, under the police power.

In *Schmidt* v. *Indianapolis,* 168 Ind., 631, 80 N. E., 632, 14 L. R. A. (N. S.), 787, 120 Am. St. Rep., 385, it is said: "The evils which attend and inhere in the business of handling and selling intoxicating liquors are universally recognized, and the danger therefrom to the peace and good order of the community everywhere necessitates the exercise of the police power The theory of the legislation upon this subject is that the business is one which requires restraint because it is harmful to

society, and the license fee is exacted for the purpose of restraining the business. This necessity for regulation and restriction in the interest of peace and good order, and for the promotion of public morals, as already said, distinguishes the liquor business from useful and harmless occupations. It is well settled that the legislative power to deal with this subject, whether it be to license, regulate, restrain, or prohibit the sale of such liquors, is unlimited. All such restrictive measures, taken either by the State or by virtue of authority delegated to municipalities, are upheld as a proper exercise of the police power."

In *Crowley* v. *Christensen*, 137 U. S., 86, 90, 91, and 92, 11 Sup. Ct., 13, 15, 34 L. Ed., 620, it is said: "It is urged that, as the liquors are used as a beverage, and the injury following them, if taken in excess, is voluntarily inflicted and is confined to the party offending, their sale should be without restrictions; the contention being that what a man shall drink, equally with what he shall eat, is not properly matter for legislation. There is in this position an assumption of a fact which does not exist, that when the liquors are taken in excess the injuries are confined to the party offending. The injury, it is true, first falls upon him in his health, which the habit undermines; in his morals, which it weakens; and in the self abasement, which it creates. But, as it leads to neglect of business and waste of property and general demoralization, it affects those who are immediately connected with and dependent upon him. By the general concurrence of opinion of every civilized and Chris-

tian community, there are few sources of crime and misery to society equal to the dramshop, where intoxicating liquors, in small quantities, to be drunk at the time, are sold indiscriminately to all parties applying.  The statistics of every State show a greater amount of crime and misery attributable to the use of ardent spirits obtained at these retail liquor saloons than to any other source.  The sale of such liquors in this way has therefore been, at all times, by the courts of every State, considered as the proper subject of legislative regulation. Not only may a license be exacted from the keeper of the saloon before a glass of his liquors can be thus disposed of, but restrictions may be imposed as to the class of persons to whom they may be sold, and the hours of the day, and the days of the week, on which the saloons may be opened.  Their sale in that form may be absolutely prohibited.  It is a question of public expediency and public morality, and not of federal law.  The police power of the State is fully competent to regulate the business—to mitigate its evils or to suppress it entirely. There is no inherent right in a citizen to thus sell intoxicating liquors by retail.  It is not a privilege of a citizen of the State or of a citizen of the United States. As it is a business attended with danger to the community, it may, as already said, be entirely prohibited, or be permitted under such conditions as will limit to the utmost its evils."

The whole body of the criminal law is but a branch of this power.  Under this, not only may men, and even women, be restrained of their liberty, because the safety

of the public requires their incarceration, but for the same reason their lives may be declared forfeit and taken from them. What is there in the manufacture of whisky that is greater than these things?

We are referred, however, to the opinion of certain text-writers, particularly that of Mr. Tiedeman. This writer says, in language which is quoted in the brief: "It is not enough that the thing may become harmful when put to a wrong use. It must be in itself harmful and incapable of a harmless use." We take issue on this statement of the doctrine. It is directly in the teeth of *Powell* v. *Pennsylvania,* 127 U. S., 678, 8 Sup. Ct., 992, 1257, 32 L. Ed., 253, the oleomargarine case; but, aside from this, it is not sound in principle. Notwithstanding the fact that an article is useful, its harmfulness to the public generally may be so great and widespread, and its distribution so secret and so difficult of control, that the legislature may protect the public by forbidding its manufacture or sale, or both, so as to root out its evil effects altogether. Who is the judge of the matter? The legislature, or the courts? If the courts, then by what shall they be guided? The constitution. But there is nothing in that instrument which by any just implication declares that an article may not be forbidden, if useful for any purpose, although its harmful effects greatly overbalance its good effects. When such an evil is discovered, it is for the legislature to say whether it shall be prohibited, or merely regulated under the exercise of its police power. Let it be granted that the courts have the right to say whether the exer-

cise of the police power is reasonable or the contrary in a given instance, is not that exercise reasonable when the thing prohibited is of such nature that it cannot be regulated, so as to protect the public from its disastrous effects, and such protection can be secured only by its extirpation? The same writer puts the question whether the legislature has the power to forbid the manufacture of dynamite, and he indicates an opinion that no such power exists, because dynamite is useful in blasting. We do not doubt that it would be in the power of the legislature to actually prohibit the manufacture of that substance. Suppose tens of thousands of men were all over the country with secret bombs in their pockets, carrying death and destruction everywhere, destroying thousands of buildings and countless lives; should any one say that the courts must stay the hand of the legislature in forbidding this manufacture because dynamite is useful in preparing the way for public and other structures, that this comparatively small use should curb the hand of power in its effort to prevent immeasurable ruin? The fallacy of the whole argument is in the assumption that, if an article is useful for any purpose, it cannot be wholly forbidden, no matter how greatly its evil capabilities and actual uses overbalance the good purposes it serves. The legislature is the judge of the times and occasions when public danger threatens, and it is for the courts to apply the test of the constitutional limitations and restrictions, and these must be applied with a careful and discriminating judgment. This writer, however, concedes, at the

close of section 125 of his work on State and Federal Control of Persons and Property, that there is an almost unbroken array of judicial opinion against his position; but he urges his views notwithstanding, because he deems that they present the sounder basis.

We are referred to section 223 of Freund's Police Power for the statement that the power of the legislature to prohibit the prescription and sale of liquor to be used as a medicine does not exist, and that the exercise of this power would be purely arbitrary, based upon *Sarrls* v. *Com.*, 83 Ky., 327. The legislation in question does not contain that prohibition, because the proviso permits the sale of alcohol which may be used for medical purposes. However, the weight of authority is against even this proposition, and in favor of total prohibition, as we shall presently show  Other textwriters declare the right of absolute prohibition.

In Black on Intoxicating Liquors, sec. 37, it is said: "It is within the power of a State to absolutely prohibit the manufacture and sale, within its borders, of intoxicating liquors, either by statute or constitutional enactment, and such prohibition is the lawful exercise of its police power, and is not open to objection on constitutional grounds. Such a law, in so far as it prohibits the sale of liquors in existence at the time of its passage, is not an *ex post facto* law, since, if it lessens the value of such liquors, such evil consequence does not make it retroact criminally in such sense as to bring it within the definition of an *ex post facto* law. Neither can it be considered as impairing the obligation of con-

tracts, though it may affect corporations or others possessing the right, by legislative grant, at the time of its enactment, to manufacture or sell such liquors. And although it may deprive persons of the right to pursue a business previously lawful, and may have the effect of diminishing the value of the property owned by them, and specially adapted to the continuance of the business, it does not, for that reason, amount to deprivation of their property or liberty without due process of law, within the meaning of the constitution. Neither does it violate the privileges or immunities secured to citizens of the United States by the fourteenth amendment. Nor, if confined to persons and property fully within the jurisdiction of the State, is it invalid as a regulation of foreign or interstate commerce." For these various propositions there is a full citation of authorities in the notes attached to the text.

In Black's Constitutional Law (Ed. of 1910), p. 402, it is said:

"That the regulation of the manufacture and sale of intoxicating liquors is a proper subject for the exercise of the police power is a proposition which has never been doubted. On all the grounds which are recognized as most safely and surely bringing a matter within the scope of this power, the production and selling of intoxicants is included within the sphere of its legitimate operations. Whatever form, therefore, the regulating or restricting law may assume, if it is not in contravention of some constitutional provision, it is to be sustained as valid on this ground. This has been the de-

cision in regard to laws totally prohibiting the manufacture and sale of liquors, laws allowing such prohibition to particular parts of the State at their option, laws licensing the traffic in liquors, regulating or prohibiting the sale on certain days or in certain places, or to particular classes of persons, authorizing the search for and seizure of liquors illegally kept for sale, imposing special or punitive taxation upon the business, and laws giving a right of action in damages to persons injured as a consequence of particular sales against the persons making such sales." To sustain the text numerous authorities are cited.

In McGehee's Due Process of Law, p. 346, it is said: "The practice of prostitution, and the manufacture of, or traffic in, intoxicating liquors, may be prohibited or regulated by the State."

In Joyce on Intoxicating Liquors, sec. 83, it is said: "The power of the State in respect to the liquor traffic is not limited to the imposing of conditions or restrictions merely which partake of the character of regulation or control. The legislature may, when in its discretion it deems it advisable, pass laws which are prohibitory in their nature and result, either as to the manufacture or sale of intoxicating liquor, or as to both."

In 23 Cyc., p. 65, it is said: "The several States, in the exercise of their power, and subject to the limitations and restrictions contained in the constitution of the United States or of the particular State, have full authority to enact any and all laws for the suppression of intemperance and minimizing the evils resulting from

the traffic in intoxicating liquors, whether by totally prohibiting, or by restricting and licensing, the manufacture and sale of such liquors."

In Woollen & Thornton's Law of Intoxicating Liquors, section 93, it is said: "The right of a State to prohibit the manufacture of intoxicating liquor within her boundaries can be no longer questioned under the many decisions of the courts, even of liquor designed for transportation to, and sale in, another State where the traffic in liquor is entirely legitimate. Such a law is valid as to those engaged in the business at the time of its passage, although the effect is to destroy their business and to greatly, if not totally, impair the value of the property used in the manufacture."

The general principle has been clearly recognized in this State. *Webster* v. *State,* 110 Tenn., 491, 504, 506, 82 S. W., 179; *Kelly* v. *Connor,* 122 Tenn., 339, 374, 375, 123 S. W., 622, 25 L. R. A. (N. S.), 201.

In *State* v. *Durein,* 70 Kan., 1, 78 Pac., 152, 15 L. R. A. (N. S.), 908, the precise question was presented. In that case it was said: "The constitutionality of the law regulating the sale of intoxicating liquor in this State is assailed, and the argument is made that the sale of liquors for medical, mechanical, and scientific purposes is a lawful and virtuous business, necessary for the welfare of the community; that permits to carry on such business must therefore be obtainable as a matter of right; that the statute gives to probate judges an arbitrary and unrestrained authority to refuse permits for

such purposes; that the vesting of such power in probate judges renders the statute void; and hence that no one can be punished for selling liquors without a permit. The opinion of the supreme court of the United States, in the case of *Mugler* v. *Kansas,* 123 U. S., 623, 8 Sup. Ct., 273, 31 L. Ed., 205, effectually disposes of this argument. Mr. Justice Harlan there showed, both by reason and upon authority, that the right to manufacture, sell, and use articles of trade is conditioned upon the fact that such conduct does not deleteriously affect the rights of the public; that, if any business becomes prejudicial to the welfare of the community, society has the right to protect itself against such injurious consequences; that the legislature of the State has the right to determine what measures are appropriate or needful for the protection of the public morals, health, and safety, and, unless a statute has no real or substantial relation to these objects, the courts cannot interfere. It is then shown that if, in the judgment of the legislature, the manufacture of intoxicating liquors for the maker's own use as a beverage would tend to cripple or defeat the effort to guard the community against the evils attending the excessive use of such liquors, prohibition may follow. So if the manufacture and sale of liquors for medical, mechanical, and scientific purposes merely opens the door to the train of evils following upon the general use of intoxicants, they may be prohibited; and, since they may be prohibited, they may be regulated in the manner prescribed by the statute of this State."

Still stronger is the case of *Cureton* v. *State,* 135 Ga., 660, 70 S. E., 332. The syllabus of the case fully expresses the substance of it, and is as follows: "The act approved August 6, 1907 (Acts of 1907, p. 81), commonly known as the 'prohibition law,' is not violative of article 1, section 1, par. 3, of the constitution of this State, which provides that no one shall be deprived of life, liberty, or property, except by due process of law, on the ground that it prohibits the manufacture of alcohol for any and every purpose, including its use for medicinal, scientific, and mechanical purposes, and its use in the arts, as well as other uses than as a beverage. Nor does the act offend this constitutional provision, because of its applicability to a person who owned and operated a distillery at the time of its passage. Nor is such act violative of the fourteenth amendment of the constitution of the United States, which provides that no State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States, nor shall any State deprive any person of life, liberty, or property without due process of law, nor deny to any person within its jurisdiction the equal protection of laws. The act mentioned above does not violate article 1, section 1, par. 2, of the constitution of this State, which declares that protection of person and property is the paramount duty of government, and shall be impartial and complete."

The right of the States of this Union to totally prohibit the manufacture and sale of intoxicating liquors is fully sustained by the following decisions of the su-

preme court of the United States: *Bartemeyer* v. *Iowa,* 18 Wall., 129, 21 L. Ed., 929; *Boston Beer Co.* v. *Massachusetts,* 97 U. S., 25, 24 L. Ed., 989; *Foster* v. *Kansas,* 112 U. S., 205, 5 Sup. Ct., 8, 97, 28 L. Ed., 629; *Mugler* v. *Kansas,* 123 U. S., 623, 8 Sup. Ct., 273, 31 L. Ed., 205; *Kidd* v. *Pearson,* 128 U. S., 1, 9 Sup. Ct., 6, 32 L. Ed., 346; *Powell* v. *Pennsylvania,* 127 U. S., 678, 8 Sup. Ct., 992, 1257, 32 L. Ed., 253.

In *Boston Beer Co.* v. *Massachusetts* the court said: "Since we have already held, in the case of *Bartemeyer* v. *Iowa,* that as a means of police regulation, looking to the preservation of public morals, a State law, prohibiting the manufacture and sale of intoxicating liquors, is not repugnant to any clause of the constitution of the United States, we see nothing in the present case that can afford a sufficient ground for disturbing the decree of the supreme judicial court of Massuchusetts."

In *Foster* v. *Kansas* the court said: "In *Bartemeyer* v. *Iowa,* 18 Wall., 129, 21 L. Ed., 929, it was decided that a State law prohibiting the manufacture and sale of intoxicating liquors was not repugnant to the constitution of the United States. This was reaffirmed in *Beer Co.* v. *Massachusetts,* 97 U. S., 25, [24 L. Ed., 989], and that question is now no longer open in this court."

In *Mugler* v. *Kansas* the court went so far as to say that a State might prohibit the manufacture of intoxicating liquors by a person for his own use, if in the judgment of the legislature it was necessary as a police measure.

Motlow v. State.

In *Kidd* v. *Pearson* the doctrines laid down in *Mugler* v. *Kansas* were approved and reaffirmed.

It is objected that what was said by the supreme court in the two cases last mentioned was matter of *dictum,* in so far as it went beyond the exact case before the court, wherein it appeared that the State enactments under consideration did not involve total prohibition, but made an exception in favor of manufacture for medical, mechanical, and scientific uses. Let it be granted; but *dicta* often repeated by that court, and repeated and sanctioned by other courts, as they have been in this State and others, finally become doctrine. In addition, the case of *Powell* v. *Pennsylvania* directly presented the question of absolute prohibition, and the decision was in favor of that measure. That the substance in question in that case was oleomargarine cannot alter the principle, because it is conceded the article was in itself useful, and not at all hurtful. The reason of the prohibition was the great danger of fraud in its being mistaken for real butter. But no one can imagine a greater field of fraud than there is in the liquor trade. Adulterations are notorious. The subterfuges practiced in the effort to place intoxicating liquors unlawfully and surreptitiously on the market are without number. When full license privileges were granted the traffic in this State, it was impossible to prevent sales to minors, and sales on Sunday, and sales without license. There is nothing which is the subject of so much fraud as the sale of intoxicating liquors. It is sad to say that even physicians have been prosecuted

for giving fraudulent prescriptions, in order to assist their patrons in obtaining intoxicating liquors unlaw-fully. See cases cited in notes to sections 508, 510, 513, 824, and 912 of Woollen & Thornton on the Law of In-toxicating Liquors; and as to the frauds of druggists in handling liquors, it is said, in the *Druggist Cases,* 85 Tenn., 458, 3 S. W., 490, that the evasions of the law were frequent and notorious. The authority of *Powell* v. *Pennsylvania* was recognized in the later case of *Schollenberger* v. *Pennsylvania,* 171 U. S., 1, 18 Sup. Ct., 757, 43 L. Ed., 49, but held not to apply to the facts of the particular case. It was also recognized in *Capitol City Dairy Co.* v. *Ohio,* 183 U. S., 238, 22 Sup. Ct., 120, 46 L. Ed., 171. In that case the following reference is made to *Powell* v. *Pennsylvania*: "In the *Powell Case* a statute absolutely forbidding the manufacture and sale, in the State of Pennsylvania, of oleomargarine, was held valid, because designed to prevent fraud." 183 U. S., 246, 22 Sup. Ct., 123, 46 L. Ed., 171.

The following cases support the principle that a pro-hibitory statute passed under the police power of the State is not a violation of the provision of the fourteenth amendment, although it is so broad as to include within its scope acts otherwise innocent, but included because of the difficulty of separating the good from the bad, the danger of fraud: *Booth* v. *Illinois,* 184 U. S., 425, 22 Sup. Ct., 425, 46 L. Ed., 623; *Otis* v. *Parker,* 187 U. S., 606, 23 Sup. Ct., 168, 47 L. Ed., 323; *Ah Sin* v. *George Wittman,* 198 U. S., 500, 25 Sup. Ct., 756, 49 L. Ed., 1142. In *Booth* v. *Illinois* the Illinois act under exam-

ination contained this provision: "Whoever contracts to have or give to himself or another the option to sell or buy at a future time, any grain, or other commodity, stock of any railroad or other company, or gold, or forestalls the market by spreading false rumors to influence the price of commodities therein, or corners the market, or attempts to do so, in relation to any of such commodities, shall be fined not less than ten dollars nor more than $1,000, or confined in the county jail, not exceeding one year, or both; and all contracts made in violation of this section shall be considered gambling contracts, and shall be void." In disposing of an objection made to this act, the court said: "It is, however, said that the statute of the State, as interpreted by its highest court, is not directed against gambling contracts relating to the selling or buying of grain or other commodities, but against mere options to sell or buy at a future time without any settlement between the parties upon the basis of differences, and therefore involving no element of gambling. The argument then is that the statute directly forbids the citizen from pursuing a calling which in itself involves no element of immorality, and therefore by such prohibition it invades his liberty as guaranteed by the supreme law of the land. Does this conclusion follow from the premise stated? Is it true that the legislature is without power to forbid or suppress a particular kind of business, where such business properly and honestly conducted may not in itself be immoral? We think not. A calling may not in itself be immoral, and yet the tendency of what is generally,

or ordinarily, or often done, in pursuing that calling, may be toward that which is admittedly immoral or pernicious. If, looking at all the circumstances that attend, or which may ordinarily attend, the pursuit of a particular calling, the State thinks that certain admitted evils cannot be successfully reached unless that calling be actually prohibited, the courts cannot interfere, unless looking through mere forms and at the substance of the matter they can say that the statute enacted professedly to protect the public morals has no real or substantial relation to that object, but is a clear, unmistakable infringement of rights secured by the fundamental law."

In *Otis* v. *Parker* the provision of the State constitution under examination was as follows: "All contracts for the sale of shares of the capital stock of any corporation or association on margin or to be delivered at a future day shall be void, and any money paid on such contracts may be recovered by the party paying it by suit in any court of competent jurisdiction." In disposing of this matter the court said: "The objection urged against the provision in its literal sense is that this prohibition of all sales on margin bears no reasonable relation to the evil sought to be cured, and therefore falls within the first section of the fourteenth amendment. It is said that it unduly limits the liberty of adult persons in making contracts which concern only themselves, and cuts down the value of a class of property that often must be disposed of under contracts of the prohibited kind, if it is to be disposed of to advan-

tage, thus depriving persons of liberty and property without due process of law, and that it unjustifiably discriminates against property of that class, while other familiar objects of speculation, such as cotton or grain, are not touched, thus depriving persons of the equal protection of the laws. It is true, no doubt, that neither a State legislature nor a State constitution can interfere arbitrarily with private business or transactions, and that the mere fact that an enactment purports to be for the protection of public safety, health, or morals is not conclusive upon the courts. [Authorities.] But general propositions do not carry us far. While the courts must exercise a judgment of their own, it by no means is true that every law is void which may seem to the judges who pass upon it excessive, unsuited to its ostensible end, or based upon conceptions of morality with which they disagree. Considerable latitude must be allowed for differences of view, as well as for possible peculiar conditions which this court can know but imperfectly, if at all. . . . If the State thinks that an admitted evil cannot be prevented, except by prohibiting a calling or transaction not in itself necessarily objectionable, the courts cannot interfere, unless, in looking at the substance of the matter, they can see that it is a 'clear, unmistakable infringement of rights secured by the fundamental law.' *Booth* v. *Illinois*, 184 U. S., 425, 429, 22 Sup. Ct., 425, 46 L. Ed., 623. No court would declare a usury law unconstitutional, even if every member of it believed that Jeremy Bentham had said the last word on that subject, and had shown

for all time that such laws did more harm than
good. The Sunday laws no doubt would be sustained by
a bench of judges, even if every one of them thought it
superstitious to make any day holy. Or, to take cases
where opinion has moved in the opposite direction, wa-
gers may be declared illegal without the aid of statute,
or lotteries forbidden by express enactment, although
at an earlier day they were thought pardonable at least.
The case would not be decided differently if lotteries
had been lawful when the fourteenth amendment be-
came law, as indeed they were in some civilized States.
. . . There is no doubt that purchases on margin
may be, and frequently are, used as a means of gambling
for a great gain or a loss of all one has."

In *Ah Sin* v. *Wittman* the court had under examina-
tion an ordinance of the city of San Francisco, the first
section of which made it unlawful for any person within
the limits of the city and county of San Francisco "to
exhibit or expose to view in any barred or barricaded
house or room, or in any place built or protected in a
manner to make it difficult of access or ingress to police
officers," any cards, etc. The second section made it
unlawful for any person to visit or resort to any such
barred or barricaded house. The plaintiff in error was
tried and convicted, and when the case reached the su-
preme court of the United States he made the point there
that the ordinance deprived him of his liberty, without
due process of law, in that he was thereby prohibited
from visiting innocently and for a lawful purpose the
house or room or place mentioned in the ordinance. In

disposing of the matter the court said: "The suppression of gambling is concededly within the police powers of a State, and legislation prohibiting it, or acts which may tend to or facilitate it, will not be interfered with by the court unless such legislation be a 'clear, unmistakable infringement of rights secured by the fundamental law.' *Booth* v. *Illinois,* 184 U. S., 425, 429, 22 Sup. Ct., 425, 46 L. Ed., 623; *Otis* v. *Parker,* 187 U. S., 606, 23 Sup. Ct., 168, 47 L. Ed., 323. As interpreted by the supreme court of the State, the ordinance cannot be so characterized. It is contended that the ordinance makes criminal 'the mere act of innocently visiting such a house or room, where the visitor had no knowledge and nothing whatever to do with the barring or barricading of the premises or the prescribed articles.' It is hence contended by plaintiff in error that 'he is deprived of his liberty without due process of law, in that he is prohibited thereby from visiting, innocently and for a lawful purpose, the house or room or place mentioned in said ordinance.' Granting for argument's sake that one might visit innocently a barred or barricaded house or room where gambling implements are exhibited or exposed to view, and if, as plaintiff in error alleges in his petition, he was convicted notwithstanding he established that he had innocently visited the house mentioned in the charge against him, we are not at liberty to declare the ordinance unconstitutional."

From the foregoing cases, and the principles underlying them, it is apparent that, although it is lawful to sell intoxicating liquors in this State for medical,

mechanical, and scientific purposes, the manufacture of such articles in this State, although in and of itself not immoral, may be prohibited, because of the great opportunity afforded by the presence of breweries and distilleries for aiding those who purpose and desire to violate the laws prohibiting the sale of intoxicating liquors as a beverage, and the temptation on the part of the breweries and distillers themselves to encourage such violations in order to make profits. A man who manufactures for purposes of sale is likely to manufacture a large quantity. Though he manufacture only for the purpose of selling for medical, mechanical, or scientific uses, the quantity may be so large as to tempt him to sell on the general market, and so interfere with the laws enacted for the prohibition of the liquor traffic. Cutting off the right of manufacture for any purpose of sale tends to prevent the creation of large stocks of liquor, and so tends directly to support the prohibition laws  The same would be true if the State had the right under federal law to prohibit importation; but it has not. This, however, should not prevent it from exercising such power as it can.

In the agreed statement of facts it is set forth that the plaintiff in error manufactured the whisky in question "for the purposes of sale," but not "for purposes of sale as a beverage within the State of Tennessee." This could only mean that he manufactured it for the purpose of selling it abroad, and also for the purpose of selling it in Tennessee for medical, mechanical, and scientific purposes. It has been held that the

State has the right to forbid the manufacture for sale and exportation to other States or countries. *Kidd* v. *Pearson,* supra. It is said in the brief that whisky is not contraband in Tennessee, inasmuch as it may be sold for medicinal purposes. Although it is true that whisky as a medicinal liquor, broadly speaking, is not contraband, yet the statute makes any whisky manufactured in Tennessee a contraband article. According to the statute it cannot be manufactured for sale, and therefore, when made, could not be sold. *Kidd* v. *Pearson, supra,* 128 U. S., pages 19 and 20, 9 Sup. Ct., 6, 32 L. Ed., 346. The constitutional right to enact such a law is, we think, fully supported by what has already been said.

The police power is a necessary one, inhering in every sovereignty, for the preservation of the public safety, the public health, and the public morals. It is of vast and undefined extent, expanding and enlarging in the multiplicity of its activities as exigencies demanding its service arise in the development of our complex civilization. It is a function of government solely within the domain of the legislature to declare when this power shall be brought into operation, for the protection or advancement of the public welfare. It is said that the courts have the right to determine whether such law is reasonable. By this expression, however, it is not meant that they have power to pass upon the act with a view to determining whether it was dictated by a wise or a foolish policy, or whether it will ultimately redound to the public good, or whether it is contrary to natural

justice and equity. These are considerations solely for
the legislature. In determining whether such act is
reasonable, the courts decide merely whether it has any
real tendency to carry into effect the purposes designed
—that is, the protection of the public safety, the public
health, or the public morals—and whether that is really
the end had in view, and whether the interests of the
public generally, as distinguished from those of a par-
ticular class, require such interference, and whether the
act in question violates any provision of the State or
federal constitution. The constitutional provisions al-.
ways cited, but not necessarily the only ones, in the
courts of this State, with a view to asserting the courts'
control over the exercise of the police power by the leg-
islature, are article 1, section 8, and article 11, section
8, of our State constitution, and the fourteenth amend-
ment to the federal constitution, which, as we have al-
ready said, are in effect the same, and which provide in
substance that no one shall be deprived of his life, lib-
erty, or property but by due process of law or the law
of the land, and no one shall be deprived of the equal
protection of the laws. These provisions forbid that
any mere individual shall be singled out for legislative
action, but do not deny the right to the lawmaking pow-
er to make proper classifications for purposes of legis-
lation. Such classification, however, must rest upon
some natural or reasonable basis, having some substan-
tial relation to the public welfare. and the same provi-
sions must approximately apply in the same way to all
of the members of the class. As to the doctrine of rea-

Motlow v. State.

sonableness, see *California Reduction Co.* v. *Sanitary Reduction Works*, 199 U. S. 306, 318, 319, 324, 26 Sup. Ct., 100, 50 L. Ed., 204; *Dobbins* v. *Los Angeles*, 195 U. S., 223, 236, 237, 25 Sup. Ct., 18, 49 L. Ed., 169; *Missouri, K. & T. Ry. Co.* v. *May*, 194 U. S., 267, 269, 270, 24 Sup. Ct., 638, 48 L. Ed., 971; *Otis* v. *Parker*, 187 U. S., 606, 608, 23 Sup. Ct., 168, 47 L. Ed., 323 *et seq.*; *Holden* v *Hardy*, 169 U. S., 366, 18 Sup. Ct., 383, 42 L. Ed., 780; *Gulf, C. & S. F. R. Co.* v. *Ellis*, 165 U. S., 150, 17 Sup. Ct., 255, 41 L. Ed., 666; *Lawton* v. *Steele*, 152 U. S., 133, 14 Sup. Ct., 499, 38 L. Ed., 385; *Mugler* v. *Kansas*, 123 U. S., 623, 8 Sup. Ct., 273, 31 L. Ed., 205; *Yick Wo* v. *Hopkins*, 118 U. S., 356, 6 Sup. Ct., 1064, 30 L. Ed., 220, and cases cited in these authorities. The doctrine of reasonableness embraces, as a part thereof, the subject of proper classification, as already indicated, and the two subjects cannot be clearly separated in the authorities; but the following may be regarded as being especially interesting upon this particular phase of the inquiry, viz.: *Chicago, B. & Q. R.* v. *McGuire*, 219 U. S., 549, 565, 31 Sup. Ct., 259, 55 L. Ed., 328; *M., K. & T. Ry. Co.* v. *May*, supra; *Connolly* v. *Union Sewer Pipe Co.*, 184 U S., 540, 559-560, 22 Sup. Ct., 431, 46 L. Ed., 679; *Magoun* v. *Illinois Trust & Savings Bank*, 170 U. S., 293-296, 18 Sup. Ct., 594, 42 L. Ed., 1037; *Holden* v. *Hardy*, supra; *Gulf, Colorado & Santa Fe R. R. Co.* v. *Ellis*, supra; *Yick Wo* v. *Hopkins*, supra.

The doctrine of reasonableness has in cases involving municipal ordinances a wider scope than in cases of the kind the court has under consideration; municipal ordi-

nances being tested, not only by the constitution, but also by the statutes of the State, and by the common law. *Yick Wo* v. *Hopkins,* supra; *Ward* v. *Mayor,* 8 Baxt., 228, 35 Am. Rep., 700; *Grills* v. *Mayor,* 8 Baxt., 247; *Maxwell* v. *Jonesboro,* 11 Heisk., 257; *Newbern* v. *McCann,* 105 Tenn., 159, 58 S. W., 114, 50 L. R. A., 476.

Our own cases upon the subject of the police power are in substantial accord with the federal authorities cited. *State* v. *Mill Co.,* 123 Tenn., 399, 131 S. W., 867; *Kelly* v. *Connor,* supra; *Malone* v. *Williams,* 118 Tenn., 390, 103 S. W., 798, 121 Am. St. Rep., 1002; *Morrison* v. *State,* 116 Tenn., 534, 95 S. W., 494; *Samuelson* v. *State,* 116 Tenn., 470, 95 S. W., 1012, 115 Am. St. Rep., 805; *Webster* v. *State,* supra; *Harbison* v. *Knoxville Iron Co.,* 103 Tenn., 421, 53 S. W. 955, 56 L. R. A., 316, 76 Am. St. Rep., 682; *Dayton* v. *Barton,* 103 Tenn., 604, 53 S W., 970; *Leeper* v. *State,* 103 Tenn., 500, 531, 53 S. W., 962, 48 L. R. A., 167 *et seq.; Marr* v. *Bank of West Tennessee,* 4 Lea, 578, 585.

Our authorities are likewise in accord upon the special subject of classification. *Stratton Claimants* v. *Morris Claimants,* 89 Tenn., 497, 15 S. W., 87, 12 L. R. A., 70; *Dugger* v. *Insurance Co.,* 95 Tenn., 245, 32 S. W., 5, 28 L. R. A., 796; *Debardelaben* v. *State,* 99 Tenn., 649, 42 S. W., 684; *Railroad* v. *Harris,* 99 Tenn., 684, 43 S. W., 115, 53 L. R. A., 921; *Malone* v. *Williams,* supra; *Ledgerwood* v. *Pitts,* 122 Tenn., 570, 125 S. W., 1036; *State* v. *Railroad,* 124 Tenn., 1, 135 S. W., 773; *State, ex rel.,* v. *Powers,* 124 Tenn., 553, 137 S. W., 1110.

Finally, it is insisted by plaintiff in error that the legislation in question is unconstitutional, as in violation of article 2, section 30, of the constitution of the State, which reads: "No article manufactured of the produce of this State, shall be taxed otherwise than to pay inspection fees."

There is no question of taxation in this case; but, as we understand it, the contention under this head is that inasmuch as the people of the State, under the section referred to, encouraged its citizens to engage in the business of manufacturing articles from the produce of the State, by freeing such articles from taxation while in the hands of the producer or manufacturer, and as the manufacturers of whisky are among those who were thus encouraged. and who built factories for the distilling of whisky and the brewing of beer, it would now be a violation of that promise to forbid such manufacture; that there was an implied guaranty that when so constructed those factories should be permitted to operate. To this it may be replied: There is nothing in the case before us to indicate that there is a single distillery, or brewery, in this State, that confines itself, in respect of the raw material it uses, to the produce of this State, or even that it uses any such raw material of the produce of the State; nor can the court take judicial notice of such thing, nor has the court any kind of information on the subject. But let it be assumed that there is such a distillery or brewery; it could not be held with any show

125 Tenn.—38

of reason, as we think, that the State, by the granting of a tax exemption, surrendered its police powers, the ultimate means of self-preservation.

We are of the opinion that none of the errors are well taken, that all should be overruled, and the judgment of the trial court affirmed.

GREEN, J., dissented for reasons submitted, but not filed for publication.