GATES *èt al. v.* LONG *et al.*

*(Nashville,* December Term, 1937.)

Opinion filed Feb. 12, 1938.

472

CHAS. L. CORNELIUS, THOS. H. MALONE, J. H. BALLEW, and WM. J. WADE, all of Nashville, and EDWIN F. HUNT and DUDLEY PORTER, JR., Assistant Attorneys-General, for appellants.

W. O. HAKE, of Dickson, W. L. FRIERSON and J. J. LYNCH, both of Chattanooga, R. R. KRAMER, of Knoxville, ROBERTS & ROBERTS, K. T. McCONNICO, and JAY G. STEPHENSON, all of Nashville, and CHAS. M. BRYAN, F.

H. GAILOR, and WILLIAM GERBER, all of Memphis, for appellees.

MR. CHIEF JUSTICE GREEN delivered the opinion of the Court.

This suit involves the validity of chapters 1, 2, and 3 of the Second Extra Session of the General Assembly of 1937, the immediate attack being on chapter 2. The chancellor overruled the demurrer to the bill and permitted the defendants to appeal.

The journal of the House of Representatives disclosed that the votes of certain of its members, the right of each of whom to a seat in that body was questioned, were cast for these measures. These votes were required to make up a constitutional majority for the bills. The first proposition of complainants accordingly is that none of these bills was legally passed by the House.

In *State of Tennessee ex rel.* v. *Shumate,* 172 Tenn., 451, 113 S. W. (2d), 381, just announced, we held that Shumate, one of the members of the House whose eligibility was challenged, remained a *de jure* member of that body in consequence of the specific decision of the House of Representatives to that effect. We understand from the record and from statements at the bar that a like decision was made by the House as to the status of the other members whose eligibility is challenged and such decision is equally conclusive of their right to participate in the deliberations of that body.

Apart from the foregoing, the only serious constitutional questions are with respect to the validity of section 3 of chapter 2 of the Acts of the Second Extra

Session of 1937. To present the entire picture, we make brief reference to chapter 1 and chapter 3 of the same session.

Chapter 1 repeals outright sections 2180-2227 of the Code of Tennessee embodying chapter 118 of the Public Acts of 1917 and amendatory acts. These statutes provided a compulsory system of primary elections for party nominations of candidates for members of the General Assembly, Governor, railroad commissioners, and Representatives and Senators in the United States Congress.

Chapter 3 is an act providing for a system of compulsory legalized primary elections for making party nominations of candidates for members of the state General Assembly and for Representatives in the United States Congress. The act provides agencies for putting said system into operation and effect, makes provision for the expenses of said primary elections and prescribes penalties for violations of the act.

Chapter 2 is entitled ''An Act to establish and provide for a system of compulsory legalized primary elections for making nominations of candidates for Governor, United States Senator and Railroad and Public Utilities Commissioner, to create necessary agencies and instrumentalities for putting said system into operation and effect; to provide for the payment of the expenses of said primary elections; and to prescribe penalties for violations of this Act.''

Speaking generally, chapter 2, in 28 sections and in some detail, undertakes to set up such a system as is indicated by its caption.

Section 3 of the act is as follows:

''Be it further enacted, That nominations provided

by this Act for candidates elected by the electors of the entire State, to-wit, Governor, United States Senator and Railroad and Public Utilities Commissioner, shall be determined on the county unit basis. For the purposes of this Act the county unit basis shall mean that the candidate who receives the highest number of popular votes in any given county shall be considered to have carried such county and shall be entitled to the full county unit vote of such county. Subject to the limitation of the next paragraph, each county shall have as its county unit vote that number of votes, divided by one hundred, which such county in the last general election cast for the party nominee for governor. In such computation a fraction shall be considered one vote.

"The maximum county unit vote of any county, irrespective of total vote cast, shall be one-eighth of one per cent. of the population of such county according to the latest officially proclaimed Federal Census as of the date of said primary election. In such computation a fraction shall be considered one vote.

"If in any county two or more candidates shall tie for the highest number of popular votes received, the county unit vote of such county shall be equally divided between the candidates so tying. The candidates receiving the highest total number of county unit votes in the State in said election shall be declared the party nominee in the manner prescribed by this Act. In computing such total there shall be counted for each candidate the county unit votes of all counties carried by such candidate. If two or more leading candidates receive the same number of county unit votes, that one who received the highest number of popular votes in the State shall be declared the nominee."

The Legislature had no intention of abandoning compulsory legalized primaries. While chapter 1 repealed the former primary law, the provisions of that law were substantially re-enacted in chapter 2 and chapter 3. As to certain offices, the primary law was altered so as to make the county unit system applicable but the unmistakable purpose of the General Assembly in this legislation was to retain the system of the party nominations in compulsory legalized primaries. Such intention was declared in the captions of chapter 2 and chapter 3 both.

With respect to their right to vote in the primary elections of their party, the Supreme Court in the Texas cases has three times said that citizens were entitled to the protection of the Fourteenth Amendment to the Federal Constitution. *Nixon* v. *Herndon,* 273 U. S., 536, 47 S. Ct., 446, 71 L. Ed., 759; *Nixon* v. *Condon,* 286 U. S., 73, 52 S. Ct., 484, 76 L. Ed., 984, 88 A. L. R., 458; *Grovey* v. *Townsend,* 295 U. S., 45, 55 S. Ct., 622, 79 L. Ed., 1292, 97 A. L. R., 680. For the same reasons they would be entitled to the protection of section 8 of article 1, and section 8 of article 11, of the Constitution of Tennessee, the equal protection of the law. That is to say the state cannot confer this right upon one class of voters and deprive another class of voters of such right unless the discrimination can be justified on some rational basis.

Neither, we take it, can the state without reason abridge this right in one class of voters and leave the right whole in another class of voters. The one-eighth of 1 per cent. limitation in those counties which it reaches amounts to excluding some of the voters from their party's primary or of debasing the ballots of all the voters.

Is there a valid reason to justify this distinction made in counties where the total vote in a party primary exceeds one-eighth of 1 per cent. of the county's population and in a county where the total vote falls below one-eighth of 1 per cent. of the population?

In our form of government a large vote in a constitutional election cannot be regarded as an evil, and dealt with as such under the police power of the state. On the contrary, universal exercise of the right of suffrage must be regarded as the ideal support of democratic institutions.

So, as said by this court in *Ledgerwood* v. *Pitts,* 122 Tenn., 570, 125 S. W., 1036, 1039, "The object of this modern invention [a party primary] is primarily for the purpose of permitting and requiring the entire electorate of that party to participate in the nomination of candidates for political office." And again, in the same case, following *People* v. *Democratic General Committee of Kings County,* 164 N. Y., 335, 58 N. E., 124, 51 L. R. A., 674, this court said that primaries were designed to put into effective operation "the underlying principle of democracy which makes the will of an unfettered majority controlling."

So it is, that restraint upon plenary participation, and the effect of such participation, in a primary election, as well as in a regular election, is destructive of the very basis of either system.

█ Devaluation of full participation in primary elections cannot be justified as a commonplace exercise of the police power. Such participation in itself does not menace the safety, health, nor morals of the state. Discrimination against the citizens of a particular coun-

ty cannot be sustained on the bare ground that they took a large part in a primary election.

■ If such discrimination can be upheld it must rest upon another principle, as the argument of appellants seems to concede. That is, the discrimination must be rested on the principle that an activity, innocent in itself, may be prohibited or regulated, if things frequently done in the pursuit of that activity tend toward a pernicious end, or if the pursuit of that activity frequently offers opportunities for fraud. This is a valid doctrine announced by this court in *State* v. *Mill Co.,* 123 Tenn., 399, 131 S. W., 867, Ann. Cas., 1912C, 248, elaborated in *Motlow* v. *State,* 125 Tenn., 547, 145 S. W., 177, L. R. A., 1916F, 177, and applied in other cases.

There is, however, this limitation upon the rule thus announced, stated in different ways in *Motlow* v. *State, supra,* and the decisions therein reviewed. If looking at the substance of the matter, the end sought to be reached, the court can see that the prohibition or regulation of the particular innocent activity has no real or substantial relation to the object of the legislation, such a prohibition or regulation will be stricken down as an infringement of rights secured by the fundamental law.

■ Now, bearing in mind that the unmistakable and avowed purpose of the Legislature in the enactment of chapter 2 and chapter 3 was to re-establish and continue in force "a system of compulsory legalized primary elections," and bearing in mind that the object of such elections "is primarily for the purpose of permitting and requiring the entire electorate" of the party to participate, we are driven to the conclusion that the one-eighth of 1 per cent. limitation has no reasonable relation to the true objective of the laws. The limitation

must therefore be regarded as an arbitrary abridgment of the rights of citizens of the counties affected and accordingly unconstitutional and void.

The one-eighth of 1 per cent. limitation is contained in the second paragraph of section 3 of chapter 2. The first paragraph of that section provides for the determination of nominations upon the county unit basis. The county unit basis is adopted, however, in the first paragraph "subject to the limitation of the next (the second) paragraph." The provision for the county unit basis and the provision for the one-eighth of 1 per cent. limitation are inseparable. We cannot say that the Legislature would have adopted the county unit basis without the one-eighth of 1 per cent. limitation. That would be perversion of the words of the lawmakers. It follows, therefore, that, if the limitation is to be stricken down, the county unit plan goes with it.

█ It does not result, however, that chapter 2 is unconstitutional as a whole. Section 3 is easily separable from the remainder of the act. That the Legislature designed the act to remain in force, regardless of the validity of section 3, is made obvious by section 27. The latter section embodies the most unequivocal rescue clause contained in any statute we have seen:

"That the provisions of this act are hereby declared to be severable. If any of its sections, provisions, exceptions, sentences, clauses, phrases or parts be held unconstitutional or void, the remainder of this act shall continue in full force and effect, it being the legislative intent now hereby declared, that this act would have been adopted even if such unconstitutional or void matter had not been included therein."

This language must be taken into account, unless ob-

servance of section 27 would frustrate the dominant legislative intent.

Section 3 being elided from chapter 2, we may look to section 3 of chapter 3 for the provision as to how nominations are to be determined. Section 3 of the latter act provides "that party nominations made pursuant to this Act shall be by popular vote; and candidates receiving the highest number of votes in said elections shall be declared the party nominees in the manner prescribed by this Act."

We might assume, when a statute provides for electing party nominees in a state-wide primary election, that the candidates receiving the highest number of votes in the state would be declared the nominees, whether there was a specific provision to that effect in the statute or not. This seems a necessary implication.

However, we are relieved of all difficulty on this point, because chapter 2 and chapter 3 were companion acts passed at the same session of the Legislature and on the same subject—compulsory legalized primaries. The rule of construing statutes *in pari materia* is of peculiar force when such statutes are enacted at the same session of the Legislature. "This being so, and the statutes having been passed at the same session of the Legislature, they should be construed as one act." *Hill* v. *Roberts,* 142 Tenn., 215, 217 S. W., 826, 828; *Bird* v. *State,* 131 Tenn., 518, 175 S. W., 554, Ann. Cas., 1917A, 634.

We can look, therefore, to one act to supply any deficiencies or omissions in the other. This is common practice in statutory construction.

"Where two acts *in pari materia* are construed together, and one contains provisions omitted from the other, the omitted provisions will be applied in the pro-

ceeding under the act not containing such provisions, where not inconsistent with the purposes of the act.'' 59 C. J., 1050.

The statutes providing for the acquisition of rights-of-way by condemnation for public highways provide no remedies for the owner to obtain compensation for his land taken. These statutes, standing alone, would have been unconstitutional for that reason. The court, however, construed them in connection with the Code sections providing proper remedies for the landowner and the Highway Acts were upheld. *State Highway Department* v. *Mitchell's Heirs*, 142 Tenn., 58, 216 S. W., 336.

Another statute providing for the exercise of the right of eminent domain, but affording the owner no remedy, was sustained by the court, in a similar manner in *Southern Railroad Co.* v. *Memphis,* 126 Tenn., 267, 148 S. W., 662, 41 L. R. A. (N. S.), 828, Ann. Cas., 1913E, 153.

We have very many statutes providing that a certain thing shall be a misdemeanor but stipulating no penalty to be inflicted for the commission of the misdemeanor. Standing alone such statutory provisions would be meaningless, but they are construed with section 10756 of the Code making general provision for the punishment of misdemeanors.

Illustrations like the foregoing might be multiplied but it seems unnecessary. Section 4 of chapter 3 provides in as many words that such act shall be construed *in pari materia* with chapter 2.

Other constitutional objections urged to chapter 2 are not substantial.

The act is assailed because the expenses of holding the primary elections thereunder are placed upon

the several counties. It is urged that this, in effect, requires the different counties to levy taxes for a purpose other than a county purpose in violation of section 29 of article 2.

Chapter 2 and chapter 3 cover the same ground that was covered by the general primary law repealed. Code, sections 2180-2227. These sections of the Code, as before stated, were taken from chapter 118 of the Pub. Acts of 1917. That statute, like the statutes before us, imposed the expense of holding the primaries upon the counties of the state.

For more than 20 years various state and county officials, charged with the enforcement of the act of 1917, have regarded the imposition of the expense of primary elections upon the counties as a constitutional exercise of delegated authority. So far as we know, the different counties of the state have all the while acquiesced in this view. We are not inclined after such long period to take a different view.

The same officials have charge of the primary elections under chapter 2 and under chapter 3 and the same ballots, poll lists, and tally sheets are used with additional names of candidates for offices, under chapter 3, printed on the same ballots.

While the Governor, the railroad and public utilities commissioners, and members of the General Assembly are state officers, and United States Senators and Representatives in Congress are federal officers, still all of these officials render much service to the counties. Members of the Legislature and Congressmen, particularly, render the greater part of their service to the counties included in their districts.

We think that expense for the holding of a primary

election is an expense for a public purpose and that the primary elections provided by chapter 2 and chapter 3 serve a purpose common to both state and county. This being true, a county tax may properly be levied for such a purpose. *Hancock v. Davidson County et al.,* 171 Tenn., 420, 104 S. W. (2d), 824; *Davidson County* v. *Kirkpatrick,* 150 Tenn., 546, 266 S. W., 107; *Hill* v. *Roberts,* 142 Tenn., 215, 217 S. W., 826; *Ransom* v. *Rutherford County,* 123 Tenn., 1, 130 S. W., 1057, Ann. Cas., 1912B, 1356.

It is also argued that the body of chapter 2 contains matter not within the scope of its caption in violation of section 17 of article 2 of the Constitution. We have examined the act carefully and do not find that it is subject to this objection. A detailed discussion of the matter would not be of profit.

On the whole case we conclude that with the elision of section 3, chapter 2 of the Acts of the Second Extra Sesson of the General Assembly of 1937 is valid, as are chapters 1 and 3 of the acts of the same session.

The decree of the chancellor is reversed, but the bill herein is sustained to the extent indicated. The costs of the cause will be divided between the complainants and the defendants.

Cook, DeHaven, and Chambliss, JJ., concur.

### Dissenting Opinion

Mr. Justice McKinney delivered the dissenting opinion.

Charles A. Gates, trustee of Shelby county, Tenn., and numerous other citizens, residents, taxpayers, and voters of Shelby county, filed the original bill herein for the primary purpose of having the "Unit Primary Bill,"

chapter 2 of the Second Extraordinary Session of the Legislature of 1937, declared unconstitutional. All necessary parties were made defendants.

The defendants by their several demurrers insisted that the bill was valid.

The chancellor overruled the demurrers, but granted a discretionary appeal to this court.

The title of said act is as follows:

"An Act to establish and provide for a system of compulsory legalized primary elections for making nominations of candidates for Governor, United States Senator and Railroad and Public Utilities Commissioner; to create necessary agencies and instrumentalities for putting said system into operation and effect; to provide for the payment of the expenses of said primary elections; and to prescribe penalties for violations of this Act."

The body of the act is divided into 28 sections, and is too lengthy to be incorporated in full in this opinion.

The principal attack on the act is directed at section 3 thereof, which is as follows:

"Be it further enacted, That nominations provided by this Act for candidates elected by the electors of the entire State, to-wit, Governor, United States Senator and Railroad and Public Utilities Commissioner, shall be determined on the county unit basis. For the purposes of this Act the county unit basis shall mean that the candidate who receives the highest number of popular votes in any given county shall be considered to have carried such county and shall be entitled to the full county unit vote of such county. Subject to the limitation of the next paragraph, each county shall have as its county unit vote that number of votes, divided by

one hundred, which such county in the last general election cast for the party nominee for governor. In such computation a fraction shall be considered one vote.

"The maximum county unit vote of any county, irrespective of total vote cast, shall be one eighth of one per cent of the population of such county according to the latest officially proclaimed Federal Census as of the date of said primary election. In such computation a fraction shall be considered one vote.

"If in any county two or more candidates shall tie for the highest number of popular votes received, the county unit vote of such county shall be equally divided between the candidates so tying. The candidates receiving the highest total number of county unit votes in the State in said election shall be declared the party nominee in the manner prescribed by this Act. In computing such total there shall be counted for each candidate the county unit votes of all counties carried by such candidate. If two or more leading candidates receive the same number of county unit votes, that one who received the highest number of popular votes in the State shall be declared the nominee."

The act further provides for the election of executive committees to administer it, and onerates the counties with the expenses of holding such primary elections.

The question as to the manner by which said act was passed in the Legislature was disposed of today in the companion case of *State of Tennessee ex rel.* v. *A. G. Shumate*, 172 Tenn., 451, 113 S. W. (2d), 381, in which the contention of the complainants was refuted.

Complainants insist that defraying the expenses of county primaries is not a county purpose, and that the

Legislature in imposing such expenses on the several counties violated article 2, section 29, of the State Constitution, which is as follows:

"The General Assembly shall have power to authorize the several counties and incorporated towns in this State to impose taxes for county and corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to State taxation."

In my opinion such an expenditure is a county purpose, and the weight of authority supports this view. *State ex rel.* v. *Michel,* 121 La. 374, 46 So. 430; *Ladd et al.* v. *Holmes,* 40 Or., 167, 66 P., 714, 91 Am. St. Rep., 457; *Heath* v. *Rotherham,* 79 N. J. L., 22, 77 A., 520; *State ex rel.* v. *Felton,* 77 Ohio St., 554, 84 N. E., 85, 12 Ann. Cas., 65; *contra Waples* v. *Marrast,* 108 Tex., 5, 184 S. W., 180, L. R. A., 1917A, 253.

Since the state through its officers acts for and on behalf of the several counties with regard to its governmental functions, the latter are essentially interested in seeing that able, efficient, and upright men are chosen to fill these important offices. This purpose more vitally affects the county than it does the state. Whatever particularly concerns the people of a county in their public capacity is a matter with reference to which expenditures would be one of a public purpose. *Shelby County* v. *Exposition Co.,* 96 Tenn., 653, 36 S. W., 694, 33 L. R. A., 717. While the highways and schools are of state concern they affect the citizens of a county in their public capacity, and the Legislature can require the counties to secure rights of way for state highways at their own expense, and can compel the counties to levy

taxes for the establishment and maintenance of public schools. *Baker* v. *Rose,* 165 Tenn., 543, 56 S. W. (2d), 732; *State ex rel.* v. *Meador,* 153 Tenn., 634, 284 S. W., 890.

Since the passage of chapter 62, Acts of 1887, the expenses incident to holding the general elections have been a charge against the counties. The primary election is an incident of the general election, and from a practical standpoint is of greater importance to the public since, as a general rule, the primary nominees are chosen in the general election.

Since the passage of the primary election law, chapter 118, Pub. Acts 1917, the expenses for holding such elections have been a charge against and paid by the respective counties without any question being raised as to their legal liability therefor. Common usage is one very valuable test or measure by which the courts may determine whether a given expenditure of public funds is or is not for "a public purpose," and to that effect are the authorities. This principle is firmly established by the decisions of this court. *Derryberry* v. *State Board of Election Commissioners,* 150 Tenn., 525, 266 S. W., 102; *State ex rel.* v. *Baseball Club,* 127 Tenn., 292, 154 S. W., 1151, 1154, Ann. Cas., 1914B, 1243. In the last-named case it is said:

"A construction of a statute or the Constitution, not emanating from judicial decision, but adopted by the legislative or executive departments of the state, and long accepted by the various agencies of government and the people, will usually be accepted as correct by the courts."

In the second place, complainants contend that there is no legal difference between the primary provided for

by the Unit Bill and a regular election. This question was considered fully in *Ledgerwood* v. *Pitts,* 122 Tenn., 570, 125 S. W., 1036, 1041. After enumerating the cases holding that a primary election is not an election within the meaning of the Constitution, the court said:

"An examination of many of these cases has disclosed the fact that they are bottomed on two propositions, namely: (1) That such primaries are not in reality elections, but merely nominating devises; and (2) that they are valuable auxiliaries for the promotion of good government and are regulated by legislative enactment for the public welfare.

"As against the array of authorities to the contrary, counsel cites the following cases, which hold that compulsory primary elections are 'elections' within the purview of the Constitution, and that the qualifications for voters in the primaries must be the same as the Constitution of the state prescribes. *Johnson* v. *Grand Forks County,* 16 N. D., 363, 113 N. W., 1071, 125 Am. St. Rep., 662; *Spier* v. *Baker,* 120 Cal., 370, 52 P., 659, 41 L. R. A., 196; *State ex rel.* v. *State Board of Canvassers,* 78 S. C., 461, 59 S. E., 145, 14 L. R. A. (N. S.), 850, 13 Ann. Cas., 1133; *People* v. *Board of Commissioners,* 221 Ill., 9, 77 N. E., 321, 5 Ann. Cas., 562.

"We do not subscribe to the reasoning of these cases, and, moreover, they are opposed to the great weight of authority."

The mere fact that the Unit Primary Bill entitles the candidate receiving the highest number of popular votes to receive the full unit vote of such county does not alter the situation. It is, nevertheless, a primary election to which the suffrage provisions of the Constitution do not apply.

In the third place, complainants charge that the act violates article 1, section 8, and article 11, section 8, of the State Constitution, in that it is arbitrary, capricious, and unreasonable class legislation. The burden is on complainants to establish the capriciousness and unreasonableness of the act. *Darnell* v. *Shepard,* 156 Tenn., 544, 553, 3 S. W. (2d), 661; *East Tennessee Motor Transportation Co.* v. *Carden,* 164 Tenn., 416, 50 S. W. (2d), 230.

In *State* v. *McKay,* 137 Tenn., 280, 306, 193 S. W., 99, 105, Ann. Cas., 1917E, 158, it was said:

"With the legislative departments rests the consideration and determination of the reasonableness of regulations under the police power, and a court will not examine the question *de novo* and overrule such judgment by substituting its own, unless it clearly appears that those regulations are so 'beyond all reasonable relation to the subject to which they are applied as to amount to mere arbitrary usurpation of power' (*Lemieux* v. *Young,* 211 U. S., 489, 29 S. Ct., 174, 53 L. Ed., 295 [*supra*]) or is unmistakably and palpably in excess of the legislative power, or is arbitrary 'beyond possible justice,' bringing the case within 'the rare class' in which such legislation is declared void."

All legislation not prohibited by the State or Federal Constitution may be enacted by the Legislature. *Prescott* v. *Duncan,* 126 Tenn., 106, 148 S. W., 229; *Motlow* v. *State,* 125 Tenn., 547, 145 S. W., 177, L. R. A., 1916F, 177; *Wright* v. *Cunningham,* 115 Tenn., 445, 91 S. W., 293; *Dayton, etc., Co.* v. *Barton,* 103 Tenn., 604, 53 S. W., 970; *Henley* v. *State,* 98 Tenn., 665, 41 S. W., 352, 1104, 39 L. R. A., 126; *Davis* v. *State,* 71 Tenn. (3 Lea), 376, 377.

It is within the power of the Legislature within reasonable limits to regulate the nomination of candidates by the enactment of primary election laws. 20 C. J., 113; 9 R. C. L., 1072; *Ledgerwood* v. *Pitts, supra*.

The Unit Bill does not single out a particular county or class, but is general in character, applicable to every county in the state without distinction or difference.

Under the authorities, the Legislature, in the exercise of the police power, is given great discretion as to the regulation of primary elections. Neither the Constitution of Tennessee nor the Federal Constitution contains a requirement that the method of nominating candidates shall be by popular vote. Such provisions for nominating candidates are of comparatively recent date. 20 C. J., 111.

Before the inauguration of the primary system candidates were not nominated by popular vote, but in conventions in which the delegates assembled and in which each county usually voted as a unit.

The county unit plan for nominating candidates for public office is much older than the party primary system. For 150 years the President of the United States has been elected by the unit vote of the states and not by the popular vote of the electorate. Under the Twelfth Amendment to the Federal Constitution, ratified in 1804, when the election of President is thrown into the House of Representatives, each state has only one vote. So that New York, with nearly three times the population of Tennessee, has no more weight or strength than the latter state.

Prior to the ratification of the Seventeenth Amendment to the Federal Constitution in 1913, United States

492

Senators were elected by the various state Legislatures and not by popular vote.

In *Davidson County* v. *Kirkpatrick,* 150 Tenn., 546, 551, 266 S. W., 107, 109, it was said:

"The county existed as a unit of government when the state was organized under the Constitution of 1796, and is an integral part, an arm, of the state. *Hill* v. *Roberts,* 142 Tenn., 215, 222, 217 S. W., 826."

In *Board of Trustees* v. *Scott,* 125 Ky., 545, 555, 101 S. W., 944, 947, it was said:

"The county as a unit of government is older in point of time among the Anglo-Saxon people than either the state or the town. The matter of local self-government with them has always found its most consistent application through the medium of the county."

The county as a unit of government was recognized and approved by this court in an opinion filed at Nashville on the 15th day of January, 1938, in the case of *William Clark et al.* v. *State ex rel. Landry C. Bobo,* 172 Tenn., 429, 113 S. W. (2d), 381, from Moore Equity. Under our democratic form of government we see no inequity in permitting a candidate who receives a majority of votes in a particular county from having the full support and strength of that county.

Under the provisions of the Unit Primary Bill every qualified voter is permitted to cast a ballot for the candidate of his choice. The number of units to which each county is entitled is determined by the same rule; namely, the number of votes divided by 100 which such county in the last general election cast for the party nominee for Governor.

Counsel have presented an array of figures from which it is argued that the unit plan may result in discrimina-

tions and irregularities in certain named counties. These counties, however, are not complaining. The fallacy of this contention, furthermore, lies in the assumption that a candidate for public office has some lawful right to have his claim to office passed upon by the popular vote of the electorate throughout the state. While, as previously stated, prior to the inauguration of the primary system, such candidate had to submit his candidacy to a convention in which the various counties composing same voted as a unit. This, most likely, produced the same character of inequalities that it is insisted may result from the operation of the Unit Primary Bill. The change from the popular to the unit vote, in my opinion, is not prejudicial to Shelby county.

In the fourth place, it is insisted that the Unit Primary Bill violates the Fourteenth Amendment to the Federal Constitution, which provides: ''No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.''

It is difficult to understand how this amendment could be said to condemn a plan approved and provided for in the original constitution.

This amendment, however, does not provide that the vote of a state shall be determined by the popular majority. In *McPherson* v. *Blacker,* 146 U. S., 1, 13 S. Ct., 3, 7, 36 L. Ed., 869, 874, it was said:

''The constitution does not provide that the appointment of electors shall be by popular vote, nor that the electors shall be voted for upon a general ticket, nor

that the majority of those who exercise the elective franchise can alone choose the electors. It recognizes that the people act through their representatives in the legislature, and leaves it to the legislature exclusively to define the method of effecting the object.''

In that case the court upheld a statute passed by the Legislature of Michigan which provided that the electors should be chosen by congressional districts, giving each district the right to choose one elector for President and one for Vice-President. Under such a system the districts might be so arranged that the electoral vote would go contrary to the popular vote.

Suppose, for example, in voting for electors for President and Vice-President in this State the Democratic electors should receive 151,000 votes and the Republican electors 150,000 votes, the entire vote of the state would be cast for the Democratic electors and the others would be entirely lost. The reverse of this situation might obtain in New York. This is the inequality as to which complainants protest. The system or plan may be faulty, but it is one which the framers of the Federal Constitution adopted and which for a century and a half the electorate has not attempted to alter. In view of this fact I am unable to see how the county unit primary, based upon this same principle, conflicts with the Fourteenth Amendment.

Counsel cite in support of their contention the cases of *Nixon* v. *Herndon,* 273 U. S., 536, 47 S. Ct., 446, 71 L. Ed., 759, and the same-styled case in *Nixon* v. *Condon,* 286 U. S., 73, 52 S. Ct., 484, 76 L. Ed., 984, 88 A. L. R., 458. The substance of the decisions in those cases was that a statute making negroes ineligible to participate in a primary election of a political party is unconstitu-

tional as depriving them of the equal protection of the laws. The Unit Primary Bill makes no such discrimination, but, on the other hand, includes all qualified voters regardless of creed, race, or color.

With regard to the power of the Legislature to regulate elections I quote from the opinion of CHIEF JUSTICE PAXSON, of the Supreme Court of Pennsylvania, in the case of *De Walt* v. *Bartley,* 146 Pa., 529, 24 A., 185, 186, 15 L. R. A., 771, 28 Am. St. Rep., 814, 815, as follows:

"There is no doubt of the power of the legislature to regulate elections. It was said in the recent case of *Cusick's Election,* 136 Pa., 459, 467, 20 A., 574 [10 L. R. A., 228]: 'The legislature has from time to time passed various laws to regulate elections. The object has always been to protect the purity of the ballot. It is too late to question the constitutionality of such legislation, so long as it merely regulates the exercise of the elective franchise, and does not deny the franchise itself.' "

In that case the court sustained an act designed "to regulate the nomination and election of public officers."

The foregoing remarks are applicable to the situation presented by this record, as will more fully appear later on in this opinion.

In the fifth place, it is urged that the bill violates the Seventeenth Amendment of the Constitution of the United States, which provides:

"The Senate of the United States shall be composed of two Senators from each state, elected by the people thereof, for six years; and each Senator shall have one vote. The electors in each state shall have the quali-

fications requisite for electors of the most numerous branch of the state legislatures.''

This contention is based primarily upon the assumption that the system under the Unit Primary Bill constitutes an election rather than a primary. For the reasons heretofore stated, I cannot assent to this proposition. It was expressly held in *Newberry* v. *United States,* 256 U. S., 232, 41 S. Ct., 469, 65 L. Ed., 913, that the provisions of the Constitution with reference to the elections of Senators and Representatives did not apply to primaries. That being true, I see no reason why party nominations of Senators and Representatives should be made in the same manner. The fact that United States Senators are chosen by the vote of the entire state while Representatives are elected from various districts within the state furnishes a reason for the different plans for nominating candidates for those offices.

In the sixth place, it is claimed that the body of the act is broader than its caption, and violates article 2, section 17, of the State Constitution, in that the body of the act provides for the creation of election commissioners, a subject not mentioned in the title. The election commissioners are the instrumentalities for carrying out or executing the act, and are covered by the phrase in the title ''to create necessary agencies and instrumentalities for putting said system into operation and effect.'' Where the subject of a statute is sufficiently stated in the title, the manner, modes, means, or instrumentalities of its enforcement, administration, or accomplishment may be embraced in its body though not recited or stated in the title. *Texas Company* v. *Fort,* 168 Tenn., 679, 80 S. W. (2d), 658; *Kee* v. *Parks,* 153

Tenn., 306, 283 S. W., 751; *Couch* v. *State,* 140 Tenn., 156, 203 S. W., 831; *People ex rel. Phillips* v. *Strassheim,* 240 Ill., 279, 88 N. E., 821, 22 L. R. A. (N. S.), 1135.

It is further insisted that the Unit Primary Bill creates criminal offenses that are not specified in the title. The phrase in the title "and to prescribe penalties for violations of this Act" is sufficient to convey notice of the offenses created in the body of the act, whether specifically or by reference.

It may be further stated that complainants are not charged with violating the act, and are in no position to raise this question. *Butler* v. *McMahan,* 166 Tenn., 511, 64 S. W. (2d), 1.

It is finally contended that the "maximum limitation" in the bill, by which the unit vote of any county shall not exceed one-eighth of 1 per cent. of the population of such county, according to the latest officially proclaimed federal census, is arbitrary, discriminatory, and unreasonable; that it abridges privileges and immunities of citizens of Shelby county, denies to them the equal protection of the laws, and deprives them of their property without due process of law, in violation of both the State and the Federal Constitutions.

In theory, at least, it is difficult to understand how a general statute, applicable alike to every county in the state and fixing their maximum unit vote upon the same basis, is arbitrary and discriminatory. The yardstick that measures the maximum unit vote to which each county is entitled in nominating party candidates for the specified offices is one-eighth of 1 per cent. of the population by the last official census. The maximum limitation fixed by the statute is in excess of the average vote in Tennessee for both parties in elections during

the past ten years. Since the population in some counties increases faster than in others it is most likely that this system may result in some inequalities. Mathematical exactness, however, in a classification is not always possible, and is not required in order to have validity. *City of Memphis* v. *State ex rel.*, 133 Tenn., 83, 179 S. W., 631, L. R. A., 1916B, 1151, Ann. Cas., 1917C, 1056; *Scott* v. *Nashville Bridge Co.*, 143 Tenn., 86, 223 S. W., 844; *Cavender* v. *Hewitt*, 145 Tenn., 471, 239 S. W., 767, 22 A. L. R., 755.

Complainants charge in the bill that the Unit Primary Statute is special legislation directed solely against Shelby county; and in support of this insistence exhibit with the bill a copy of the Governor's message to the second extraordinary session of the Legislature of 1937, from which we quote as follows:

"Until within the past thirty days the people had every prospect of seeing this program work out in the way it had begun. Then suddenly the shadow of personal ill will fell across it, and it was made definitely apparent to me that because the Governor of the State could not specify the resentment of an individual the whole program of progress for which you and I had labored was to be discredited and systematically destroyed. As an earnest of how this was to be effected, and as a show of capacity to scuttle the ship, I was informed that those in control of the election machinery in a single county had seen to it that there had been registered as eligible to vote 117,000 names in that county and that under the artificial stimulation which those in charge of the election machinery were able to supply, as shown by past history, no limit on a continued increase seemed in prospect.

"There is, of course, no one among you who believes that 117,000 voters have registered in any county in this State. This number constitutes more than a third of the total vote that is normally expected in a Democratic primary, and when it is considered that in the county where this inflated registration exists close to the whole strength of the registration list is generally counted as voting unanimously it can be seen that its effect could not be less than controlling upon any issue upon which there was elsewhere any material difference of opinion. Add to this the consideration that this was but the preliminary registration and that supplemental registrations were yet to follow and the control that could be exercised is all the more apparent. There is already registered in Shelby County a number amounting to some 35% of the population of that County according to the last Federal Census. In Davidson County, with a population of 255,000 their registration is approximately 17,000. This is less than 7% of the population which shows that the registration in Shelby is five times as great in accordance with its population as the next largest city in the state. This same comparison could be made to all the other counties in the state where the genuine interest in government is just as strong as it is in Shelby with a like result. In all the discussion raised by this enormous registration, and the announced purpose to use it to defeat the will of the rest of the state, no one has been heard to claim that such registration actually represents 117,000 votes. No one has had the temerity to make such an assertion. It has not been said that such number of votes has actually registered. It has only been said that they would be counted, together with whatever additional numbers of votes the

powers who control the election machinery of Shelby County see fit to add as supplemental registration yet to be held prior to the next election.

"The question presented to me by the definite notice given of this war on your program and mine, and a program which we confidently believe the people want executed, and by the announcement that the enormous totals to be returned in Shelby for that purpose, was whether to sit supinely while such a sabotage took place, or whether to take immediate steps to prevent it, and to quarantine within the confines of one county the results of an improper and inflated registration list. It has been mine to choose between vascillation and the placing of the members of this General Assembly on notice that their work is now endangered by this situation. . . .

"After thoughtful reflection and after the suggestion coming from the different parts of the state where honest people insisted that the present condition had grown intolerable, the simplest remedy suggested, and the one easily understood by everybody seems to me to be the adoption of a primary system whereby a definite influence in determining the results of a primary would be assigned and guaranteed to each county, in proportion to the vote cast for party nominees in the preceding election, limited only by the comparative population of that county to others. Under this method, the peculiar advantage enjoyed now by one county where votes are habitually counted as a unit would not any longer be unique, and if the stench of ballot box debauchery anywhere arose, its influence would be confined to the county of its locality. As it is today, this condition not only affects the results in Shelby County, but it overflows and floods the normal majorities of every other county in

the State. The one thing that makes me marvel at those who are shedding copious tears over the claim that this disfranchises somebody, is that each and every one knows in his heart that I have described the conditions truly. Each one further knows in his heart that my proposal does not disfranchise a single legitimate vote in Tennessee. Each one knows in his heart that justice and fair play require that every county be given the privilege which Shelby arrogates to itself now, of casting its vote as a unit. No election can be held without a minority loses, and there is no disfranchisement to say that a minority in a county did not carry the county. That is a sophistry that does not rise to the dignity of logic.''

Upon the issue thus made a heated contest was waged in the Legislature, and the Unit Primary Bill, recommended by the Governor, was passed.

It does not appear what evidence was presented to the Legislature as to fraud and illegal voting in Shelby county, or as to whether evidence of corruption in elections in other counties was considered. Numerous cases of election contests from other counties have come before this court in recent years in which fraudulent and illegal voting was engaged in. Also, a number of criminal cases where convictions were had for violating the election laws. The Legislature applied the new Primary Bill to every county in the state, and not alone to Shelby county. It is quite evident that the purpose of the Legislature in passing this bill was to safeguard the purity of the ballot.

Since, as previously stated, the Legislature has a broad discretion under the police power in enacting laws for the regulation of elections, its action in the matter

is beyond the power of the court to revise or veto, if there is any reasonable basis upon which the act can be sustained. Certainly, the prevention of fraud and corruption in elections is a ground for legislative action. In *Motlow* v. *State,* 125 Tenn., 547, 145 S. W., 177, 180, L. R. A., 1916F, 177, it is said:

"Was the creation of such a class an arbitrary act, or is there any reason by which it can be justified? The principles on which the inquiry should be conducted are those laid down in a very recent opinion of the Supreme Court of the United States, in *Lindsley* v. *Natural Carbonic Gas Co.,* 220 U. S., 61, 31 S. Ct. 337, 55 L. Ed., 369 [Ann. Cas., 1912C, 160] : '(1) The equal protection clause of the fourteenth amendment does not take from the state the power to classify in the adoption of police laws, but admits of the exercise of a wide scope of discretion in that regard, and avoids what is done only when it is without any reasonable basis, and therefore it is purely arbitrary. (2) A classification having some reasonable basis does not offend against that clause merely because it is not made with mathematical nicety, or because in practice it results in some inequality. (3) When the classification in such a law is called in question, if any state of facts reasonably can be conceived that would sustain it, the existence of that state of facts at the time the law was enacted must be assumed. (4) One who assails the classification in such a law must carry the burden of showing that it does not rest upon any reasonable basis, but is essentially arbitrary.' . . . It is said that the courts have the right to determine whether such law is reasonable. By this expression, however, it is not meant that they have power to pass upon the act with a view to determining whether it was dictated

by a wise or a foolish policy, or whether it will ultimately redound to the public good, or whether it is contrary to natural justice and equity. These are considerations solely for the Legislature.''

The court cannot question the good faith of the Legislature, nor consider the policy or wisdom of a statute enacted by it. *Butler* v. *McMahan*, 166 Tenn., 511, 64 S. W. (2d), 1; *Nashville, C. & St. L. Ry.* v. *Marshall County*, 161 Tenn., 236, 30 S. W. (2d), 268; *Quinn* v. *Hester*, 135 Tenn., 373, 186 S. W., 459.

In the passage of laws regulating elections, looking to the purity of the ballot, the power, under the Constitution, is vested in the Legislature, and the court cannot substitute its judgment for that of the lawmaking body.

To hold that the Unit Primary Law is invalid would be to hold, in effect, that the Legislature is without power to regulate and safeguard elections.

If the Unit Primary Bill is a bad law, the remedy is to elect a Legislature that will right the wrong. In *Koen* v. *State,* 162 Tenn., 573, 582, 39 S. W. (2d), 283, 285, it is said:

''If a doubt existed, it must be resolved in favor of the act, because the courts cannot properly adjudge an act invalid unless the violation of the Constitution is, in their judgment, clear, complete, and unmistakable.''

My conclusions with respect to the Unit Primary Bill may be briefly summarized as follows:

1. The purpose of the act is to prevent fraud and illegal voting in primary elections.

2. That while neither the State nor the Federal Constitution expressly authorizes the judiciary to annul a statute, it has become the settled canon of American

jurisprudence that the final authority in determining whether or not the Legislature, in enacting a statute, acted within its constitutional authority, is vested in the judiciary. 12 C. J., 775-777.

3. That this power should be exercised with great caution, and a statute vetoed only when it clearly conflicts with the fundamental law of the land.

4. That where doubt exists the doubt must be resolved in favor of its validity.

5. That with regard to the regulation of elections, looking to the purity of the ballot, the Legislature is accorded a very wide discretion.

6. That the Legislature, before passing a proposed bill, accords the interested parties a hearing, considers the measure upon its merits, and acts in accordance with what it deems wise and proper in the premises. The court is without knowledge as to the facts and the situation that prompted the Legislature to pass a bill, and in declaring it invalid, in effect, substitutes its judgment for that of the lawmaking body, which is an encroachment upon the legislative domain.

7. No case has been cited, and I have been unable to find one, where any court, state or federal, ever declared a statute unconstitutional that was passed for the purpose of regulating elections, with the exception of the Texas cases, in which the involved statutes excluded all negroes from voting in the Democratic primaries, a situation in no sense analogous to that under consideration.

8. For the foregoing reason, I think the act is a valid exercise of the police power that in nowise conflicts with either the State or the Federal Constitutions.