METROPOLITAN DEVELOPMENT
AND HOUSING AGENCY, et
al., Appellants,

v.

The Honorable William LEECH, Attorney
General for the State of Tennessee et
al., Appellees.

Supreme Court of Tennessee.

Dec. 10, 1979.

Stone & Hinds, P.C., R. Thomas Stinnett, Knoxville, for Tinsley et al.

George E. Barrett, Nashville, for Metropolitan Develop. & Housing.

Dale C. Workman, Knoxville, for Knox Co. and C. Howard Bozeman, Judge.

William M. Leech, Jr., Atty. Gen., William W. Hunt, III, Asst. Atty. Gen., Nashville, James G. O'Kane, Poore, Cox, Baker, Ray & Byrne, Knoxville, for Knoxville Community Develop. Corp.

John L. Kennedy, Metropolitan Atty., Nashville, for appellees.

COOPER, Justice.

## OPINION

This is a declaratory judgment action, questioning the constitutionality of the 1978 amendments to the Housing Authorities Law, T.C.A. § 13–801 et seq., contained in Acts 1978 (Adj.S.), ch. 854. The chancellor upheld the amended provisions, and the case is before us on appeal as of right, Tenn.R.App.Proc. 3, under the provisions of T.C.A. § 16–408, pertaining to the review of decisions in which the constitutionality of a statute is the sole determinative question. We affirm.

The several provisions under attack are appended to the text of this opinion for reference. In essence, their object is to provide a means by which a municipality may stimulate, and, in part, finance, the redevelopment of blighted urban areas. Under the statute, areas are selected for renewal by a housing authority, a "public body corporate" which, when constituted by a city, is effectively a municipal agency. See T.C.A. § 13–802, § 13–901 et seq. . . The property is purchased by the authority with funds from a bond issue, and then redeveloped as necessary and resold to private interests. After the sale, any property taxes due either the county or the municipality that are attributable to an increase in the property's value after its purchase by the housing authority are allocated to the authority to retire the bonds that funded the purchase.[1] When the bonds for a given project are retired, all property tax receipts from that tract are treated once more as are those from any other property. This method of financing urban renewal, termed "tax increment financing," has been used in a number of other jurisdictions. See e. g., M.C.L.A. § 125.1664 et seq.; M.S.A. § 472A.01 et seq.

The appellants have questioned the constitutionality of the amended provisions on several grounds. Their more significant claims are those that arise with respect to Art. 2, § 29, and, by reference, Art. 2, § 28, of the state constitution. These sections provide, in pertinent part:

§ 28: . . . [A]ll property real, personal or mixed shall be subject to taxation, but the Legislature may except [certain species of property] . . . .

\* \* \* \* \* \*

---

1. Excepting taxes levied by any taxing agency for the payment of bonds or other indebtedness. T.C.A. § 13–817(7).

The ratio of assessment to value of property in each class or subclass shall be equal and uniform throughout the State, . . . . Each respective taxing authority shall apply the same tax rate to all property within its jurisdiction.

§ 29: The General Assembly shall have power to authorize the several counties and incorporated towns in this State, to impose taxes for County and Corporation purposes respectively, in such manner as shall be prescribed by law; and all property shall be taxed according to its value, upon the principles established in regard to State taxation. But the credit of no County, City or Town shall be given or loaned to or in aid of any person, company, association, or corporation, except upon an election to be first held . . .

The appellants' first argument is based upon the clause of Art. 2, § 29, which states that taxes may be imposed by the counties and cities "for County and Corporation purposes, respectively." In the past, this provision has been interpreted as prohibiting either a county or a city from appropriating funds to a purpose not properly within its own sphere of action, either on its own initiative, or at State direction. *See e. g., Judges' Salary Cases*, 110 Tenn. 370, 75 S.W. 1061 (1903). The appellants claim that this prohibition is violated by the statutory requirement that the county appropriate funds to a municipal housing authority within its borders, in that such an authority serves a municipal, and not county, purpose. We disagree. The upgrading of blighted urban areas is not only a municipal purpose, but the proper concern of both the county in which the municipality lies and the state as a whole. *Cf. West v. Tennessee Housing Development Agency*, 512 S.W.2d 275 (Tenn.1974); *Oehmig v. City of Chattanooga*, 168 Tenn. 618, 80 S.W.2d 83 (1935). The state may direct a county to expend funds for a state purpose, or for a purpose common to the state and the county, without falling afoul of Art. 2, § 29. *Richardson v. City of Chattanooga*, 214 Tenn. 384, 381 S.W.2d 1 (1964); *Gates v. Long*, 172 Tenn. 471, 113 S.W.2d 388 (1938).

■ The appellants also contend that the amended statutes authorize the lending of public credit to a corporation, the housing authority, without prior authorization by the electorate, again in violation of Art. 2, § 29. This argument must fail because, as the housing authority alone is liable on the bonds issued, there is no lending of the credit of either the municipality or the county. *See Fort Sanders Presbyterian Hospital v. Health and Educational Facilities Board of County of Knox*, 224 Tenn. 240, 453 S.W.2d 771 (1970).

■ The appellants have also raised the question of whether there is a violation of those clauses of Art. 2, §§ 28 and 29 that require that all property be taxed uniformly according to its value. It is their theory that these provisions should be interpreted as requiring that all property subject to taxation by a particular taxing entity contribute to the expenses of that entity in proportion to its value, a requirement which, by their argument, would be violated by tax increment financing because it diverts a portion of the property taxes collected by the county on the redevelopment property to the housing authority, causing the redevelopment property to contribute less, in proportion to its value, to the cost of general county services. This argument is without merit. In the past, the requirements of taxing uniformity in these sections, insofar as they are relevant to this case, have been interpreted as requiring only that the tax burden apply equally to all nonexempt property. *See, e. g., King v. Sullivan County*, 128 Tenn. 393, 160 S.W. 847 (1913). We can find no reason to extend that interpretation as has been suggested by the appellants. However, even were we to do so, we do not believe that it would have any application here. The appellants' argument appears to be implicitly grounded upon a misconception of the nature of tax increment financing. The statutes as amended do not grant the housing authority or the municipality any additional taxing power with respect to the redevelopment property, nor, conversely, do they take such power away from the county. Neither

does the statute require that a given parcel contribute "its" taxes to the housing authority. When T.C.A. § 13–817 speaks of allocating a portion of the taxes received from the redeveloped property to the housing authority, it means only that the various taxing entities shall appropriate an amount equal to that specified portion of the taxes received from the subject property to the authority, not that the actual taxes received from that parcel are in any sense to be set aside. Given that money is perhaps the quintessential fungible good, we cannot believe that the legislature intended any other interpretation. Once it is recognized that we are dealing with a mandated appropriation, whose amount is regulated by the taxes received from the subject property, and not with a transfer, direct or indirect, of taxing power, the appellants' argument fails.

■■■ The appellants next claim that the statute violates Art. 1, § 21 of the Tennessee constitution, and the due process clause of the 14th amendment of the federal constitution, by authorizing the taking of property without either the consent of the elected representatives of those affected, or adequate compensation. Assuming that a mandatory appropriation of tax funds may be construed to be a taking within the contemplation of these constitutional provisions, we find no violation. The statutory program has been authorized by the General Assembly. The legislature may, in its discretion, require the expenditure of local funds for appropriate purposes. *Demoval & Co. v. Davidson County*, 87 Tenn. 214, 10 S.W. 353 (1889). While certain decisions with respect to the implementation of the statute, including, indirectly, the amount of public funds that will be appropriated, have been delegated to the housing authority, there is no constitutional requirement that all bodies to which the legislature has delegated aspects of the implementation of its programs be directly accountable to the electorate. *Cf. State v. Edwards*, 572 S.W.2d 917 (Tenn.1978).

■■■ The appellants have raised, but do not press, a number of other arguments.

Their claim that the statute violates the equal protection clause of the 14th amendment of the federal constitution, in that the effect of tax increment financing is to place upon the owners of the redevelopment property proportionately less of the burden of paying for general county and municipal services, is based upon the same misconception of the nature of the statutory scheme as was discussed previously with respect to the appellants' arguments predicated upon the uniform taxing provision of the Tennessee constitution, and is, for the same reason, baseless. The appellants have also failed to demonstrate any way in which the delegation of power to the housing authority is, as they claim, either excessive or improper. *Cf. State v. Edwards*, 572 S.W.2d 917 (Tenn. 1978). Finally, with respect to the appellants' claim that tax increment financing impairs the obligation of contracts, in violation both of Art. 1, § 10 of the federal and Art. 1, § 20 of the Tennessee constitutions, we note, first, that, as none of the appellants alleges that it is a party to a contract whose rights thereunder might be impaired by these statutes, none has standing to raise this question. However, we would say that, at least with respect to bonds and similar debt obligations of the taxing entities concerned, the provisions of T.C.A. § 13–817(7) appear to be sufficient to prevent any unconstitutional impairment.

The chancellor's decree is affirmed. Costs will be taxed to the appellants.

BROCK, C. J., and FONES, HENRY, and HARBISON, JJ., concur.

### APPENDIX

T.C.A. 13–804. Powers of housing authority.—An authority shall have the following powers:

(1) * * *

(5) To provide for the construction, reconstruction, rehabilitation, improvement, alteration or repair of any housing project or any part thereof by direct sponsorship of the authority, by the purchase of a mortgage or by the making of a mortgage loan to a not-for-profit entity

or corporation. Provided, however, that in the event it becomes necessary for an authority to issue bonds for the obtaining of capital to purchase a mortgage or the making of a mortgage loan as provided for in this section, said bond issue shall first be approved by ordinance or resolution of the local governing body.

(6) * * *

T.C.A. 13–813. Blighted areas defined.— Blighted areas are areas (including slum areas) with buildings or improvements which, by reason of dilapidation, obsolescence, overcrowding, faulty arrangement or design, lack of ventilation, light and sanitary facilities, excessive land coverage, deleterious land use, or obsolete layout, or any combination of these or other factors, are detrimental to the safety, health, morals, or welfare of the community.

T.C.A. 13–814. Powers of housing authority as to blighted areas.—Any housing authority now or hereafter established under and pursuant to the provisions of the Housing Authorities Law (including any municipal housing authority whether created under and pursuant to the provisions of such law or of any special statute) may carry out any undertaking hereinafter called a redevelopment project and to that end may:

(1) acquire blighted areas;

(2) acquire other real property for the purpose of removing, preventing, or reducing blight, blighting factors, or the causes of blight;

(3) acquire real property where the condition of the title, the diverse ownership of the real property to be assembled, the street or lot layouts, or other conditions, prevent a proper development of the property and where the acquisition of the area by the authority is necessary to carry out a redevelopment plan;

(4) clear any areas acquired and install, construct, or reconstruct streets, utilities, and site improvements essential to the preparation of sites for use in accordance with the redevelopment plan;

(5) Sell or lease land so acquired for uses in accordance with the redevelopment plan;

(6) Accomplish a combination of the foregoing to carry out a redevelopment plan; and/or

(7) Have and enjoy all the rights, powers, privileges and immunities granted to housing authorities under such law, and/or under any special act by which the authority may have been created, and/or any other provisions of law relating to slum clearance and housing projects for persons of low income;

(8) Borrow money upon its bonds, notes or other evidences of indebtedness to finance any of the foregoing and to carry out a redevelopment plan and secure the same by pledges of its income and revenues generally or its income and revenues from a particular redevelopment project or projects, including moneys received by any authority and placed in a special fund or funds pursuant to tax increment financing provisions contained in a redevelopment plan, or from grants or contributions from any government, or in any other manner.

Provided that nothing contained in §§ 13–812, 13–913 and/or in any special municipal housing authorities law shall be construed as limiting the power of an authority, in the event of default by a purchaser or lessee of land in a redevelopment plan, to acquire property and operate it free from restrictions contained in said §§ 13–812, and 13–913 or in any special statute as aforesaid relating to tenant selection or operation without profit.

T.C.A. 13–817. Redevelopment plan containing tax increment financing provisions—Allocation of taxes collected—Contents of plan—Tax status of property leased.

(1) Any authority may, and is hereby authorized to, adopt a redevelopment plan or to amend an existing redevelopment plan so that it contains a tax increment financing provision providing that taxes, if any, levied upon property leased or sold to individuals or corporations for development in a redevelopment project each

year, by any taxing agency after the effective date of the resolution of the governing body approving such redevelopment plan or amendment, shall be divided as follows:

(a) That portion of the taxes which would be produced by the rate at which the tax is levied each year by each taxing agency upon the assessed value of such property as shown upon the assessment roll of the appropriate assessor as of the date of the most recently determined valuation prior to the acquisition of such property by the authority (said assessment value being herein called the "base assessment"), shall be allocated to, and when collected, shall be paid to the respective taxing agencies as taxes levied by such taxing agencies on all other property are paid; provided, however, that in any year in which the actual assessment of the area comprising a redevelopment project is less than the base assessment, there shall be allocated and paid to the respective taxing agencies only those taxes actually produced by the application of the current tax rates against such actual assessment;

(b) All the taxes levied in each year in excess of the amount provided for in subparagraph (a) of this paragraph shall be allocated to and, when collected, shall be paid into a special fund or funds of the authority to pay the principal of and interest on bonds, loans or other indebtedness incurred or to be incurred by the authority to finance or refinance, in whole or in part, the redevelopment project contemplated by such redevelopment plan;

(c) Upon the retirement of all bonds, loans or other indebtedness incurred by the authority and payable from such special fund or funds or at such time as moneys on deposit in such special fund or funds are sufficient for such purpose, all the taxes referred to in subparagraph (b) hereof shall, when collected, be paid to the respective taxing agencies as taxes levied by such taxing agencies on all other property are paid; and

(d) Taxes shall be levied and collected over all or any part of the area comprising a redevelopment project in the manner provided by law with the following exceptions:

(i) The appropriate assessor shall, in each year during the period in which taxes are to be allocated to the authority pursuant to (b) above, compute and certify the net amount, if any, by which the then current assessed value of all taxable property which is subject to taxation by the particular taxing agency exceeds the base assessment. The net amount of any such increase is referred to in this subparagraph (d) as the incremental value for that particular year.

(ii) In any year in which taxes are to be allocated to the authority pursuant to (b) above in which there is an incremental value, the appropriate assessor shall exclude it from the assessed value upon which he computes the tax rates for taxes levied that year by the taxing agency. However, he shall extend the aggregate tax rate of such taxes against the base assessment and the incremental value and shall apply the taxes collected therefrom, subject to any other provisions hereof, as provided above.

(iii) For purposes of this Section [13–817,] if in any year property comprising a portion of a particular redevelopment project shall be removed from the tax rolls of a taxing agency, the base assessment for the area of such redevelopment project shall be reduced by the amount of the base assessment allocable to the property so removed for each subsequent year in which taxes are to be allocated to a particular authority pursuant to the above provisions.

(2) If an authority adopts a redevelopment plan or an amendment to an existing plan which includes tax increment financing provision, such new plan or the existing plan, as so amended, shall describe, in addition to the matters required by paragraphs (1), (2) and (3) of Section 13–815, the following:

(a) An estimate of the cost of the redevelopment project;

(b) The sources of revenue to finance the costs of the project, including the estimated tax increment;

(c) An estimate of the amount and the final maturity of bonded or other indebtedness to be incurred; and

(d) An estimate of the impact of the tax increment financing provision upon all taxing agencies in which the redevelopment project is to be located.

The foregoing information set forth in this paragraph shall be made available to the public not less than five (5) days prior to the date set for the public hearing hereinafter required by paragraph (3) of this section.

(3) No redevelopment plan containing a tax increment financing provision or amendment to an existing plan adding a tax increment financing provision shall be effective unless and until it has been approved by the governing body of the municipality following a public hearing as provided in Section 13–815. The notice of the public hearing shall be given in the manner and shall contain the information required by Section 13–815 and shall additionally set forth in clear and plain language the contemplated use of tax increment financing in connection with the redevelopment project. Such notice shall also set forth where the information required by subsection (2) of this section may be obtained. Not less than twenty-one (21) days prior to the date set for the public hearing, the governing body shall deliver or mail, postage prepaid, to each taxing agency currently levying taxes upon any property in the project area, and which would be affected by the tax increment financing provision, a copy of the notice of the public hearing, together with a statement that if the redevelopment plan containing a tax increment financing provision or amendment to an existing plan adding a tax increment financing provision is approved, certain property taxes resulting from increases in assessed valuation of property situated within the area included in the plan above the assessed value of such property appearing on the appropriate assessment rolls at last determined prior to the acquisition of such property by the authority may be allocated to a special fund or funds of the authority for redevelopment purposes rather than being paid into the treasury of the taxing agency.

(4) The foregoing provisions of subsection (2) and (3) above shall not apply to any redevelopment plan or amendment to an existing plan which included a tax increment financing provision and which has been submitted to and approved by the governing body of the municipality (or agency designated by it or empowered by law so to act) in which any of the area to be covered by the redevelopment project is situated pursuant to and in accordance with the provisions of Section 13–815 prior to [the effective date of this act] and said previously approved redevelopment plan or amendment thereto described above shall not be required to be resubmitted and approved by said governing body (or agency) pursuant to the additional provision of subsections (2) and (3) above. Provided, however, that the remaining provisions of this subsection shall be applicable to and govern said previously approved plan and the tax increment financing provision contained therein.

(5) After the approval by the governing body of a redevelopment plan containing a tax increment financing provision or an amendment to an existing plan adding a tax increment financing provision, the clerk or other recording official of such municipality shall transmit to the appropriate tax assessors and to each taxing agency to be affected, a copy of the description of all land within the redevelopment area and the date or dates of its acquisition by the authority, a copy of the description of all property leased or sold to individuals or corporations for development in the redevelopment area, a copy of the resolution approving the redevelopment plan or approving an amendment thereto, and a map or plat indicating the boundaries of such property, and taxes shall thereafter, when collected, be allo-

cated and paid in the manner provided in such redevelopment plan or amendment thereto.

(6) Any property which the authority leases to private individuals or corporations for development under a redevelopment plan and any property which the authority has developed under a redevelopment plan and leases to private individuals or corporations shall have the same tax status as if such leased property were owned by such private individuals or corporations.

(7) Notwithstanding anything to the contrary in this Section [13–817], taxes levied upon property subject to tax increment financing provisions by any taxing agency for the payment of principal of and interest on all bonds, loans or other indebtedness of such taxing agency and taxes levied by or for the benefit of the State of Tennessee shall not be subject to allocation as provided in subsection (1) of this section, but shall be levied against such property and, when collected, paid to such taxing agency as taxes levied by such taxing agency on all other property are paid and collected."